**HGN CORPORATION, Plaintiff,**

v.

**CHAMBERLAIN, HRDLICKA, WHITE, JOHNSON & WILLIAMS, et al., Defendants.**

No. 85 C 8081.

United States District Court, N.D. Illinois, E.D.

Aug. 29, 1986.

Thomas F. Ging, Alan J. Mandel, Reuben & Proctor, Chicago, Ill., for plaintiff.

Barry S. Alberts, Frederic R. Klein, Meera Werth, Schiff Hardin & Waite, Chicago, Ill., for defendants Chamberlain, Hrdlicka, White, Johnson and Williams.

Ralph E. Brown, Dominique M. Frigo, Paul W. O'Malley, Jr., Walsh, Case, Coale & Brown, Chicago, Ill., for defendant Lance H. Farrell.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

HGN Corporation ("HGN") has filed an eight-count First Amended Complaint (the "Complaint") against Texas law firm Chamberlain, Hrdlicka, White, Johnson & Williams ("Firm"), Firm partner Lance Farrell ("Farrell"), Efren Cenoz Baca ("Cenoz"), and Banco Nacional Perquero y Portuario, S.A. ("Banpesca"), charging:

1. violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Counts I to IV);

2. common law fraud (Count V);

3. violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Deceptive Trade Practices Act, Ill. Rev. Stat. ch. 121–1/2, ¶¶ 262 and 312 (Count VI);

4. negligent misrepresentation (Count VII); and

5. breach of guaranty (Count VIII);

all arising out of the tax shelter transaction described later in this opinion.[1] Now both Firm and Farrell have moved:[2]

1. under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss Counts I through IV; and

2. under Rule 56 for summary judgment as to the entire Complaint.[3]

---

1. On December 16, 1985 this Court sua sponte issued a memorandum opinion and order:
   1. dismissing Firm from Complaint Counts I and III; and
   2. dismissing Complaint Count VI in its entirety.
   Accordingly the current motions have not addressed those claims.

2. Farrell adopted Firm's motion in toto, so this opinion will consistently refer to the "Firm-Farrell" arguments, even though Firm's memoranda alone addressed them. Farrell separately advanced the meritless clean-hands arguments dealt with in the final portion of this opinion. As for Cenoz, he initially attempted to adopt the Firm-Farrell motions in their entirety. On January 13, 1986 this Court sua sponte struck that motion as obviously and facially inappropriate, given the substantial differences in the Complaint's allegations against Cenoz and the Firm-Farrell defendants. Nonetheless Cenoz proceeded to copy Firm's motions for summary judgment and to dismiss. On May 8, 1986 this Court granted HGN's motion to strike Cenoz' motions for failure to comply with this District Court's General Rules 12(e) and 13(a). Cenoz has not since renewed his motions. Finally, as to Banpesca, it has not appeared in this action at all.

3. Firm Mem. 35 n.* reflects a total misconception of the scope of Rule 56 and the role summary judgments play in federal procedure. It says this:
   > Though the Chamberlain firm denies completely the truth of HGN's allegations of wrongdoing or fraud, giving due respect to the legal principles governing the disposition of Rule 56 motions, the Chamberlain firm has

For the reasons stated in this memorandum opinion and order, their summary judgment motions are granted as to Counts I through IV (mooting the Rule 12(b)(6) motion) and denied in all other respects.

### Summary Judgment Facts[4]

Farrell, a Firm partner, incorporated Pacific Tuna Corporation ("PTC") on behalf of Cenoz in 1982, to hold title to four tuna fishing vessels then under construction (Martin Aff. ¶ 6). Banpesca had provided the original construction financing for the vessels (id. ¶ 4). In 1982 Cenoz and PTC began to seek American financing to finish the tuna vessels and to stave off yard sales threatened by the shipbuilders (Firm Statement of Material Facts ["Firm St."] ¶ 16).

Accordingly PTC representatives travelled to Chicago in late December 1982 to negotiate a tax-benefit transfer arrangement with HGN under the Safe Harbor Lease provisions of the Internal Revenue Code (Martin Aff. ¶ 10). PTC eventually agreed on such a transfer to HGN for $6 million (Posner Dep. 119; Pritzker Dep. 112–15).

HGN refused to close the transaction until PTC obtained an insurance policy or letter of credit protecting HGN (Eisenberg Dep. 101; Connolly Dep. 223), but PTC was unable to do that before December 31, 1982 (Handelsman Dep. 159). Accordingly the parties restructured the transaction into a $7 million loan, $6 million of which HGN would convert into a safe harbor lease by January 31, 1983 on PTC's satisfaction of the necessary conditions (id. 157–59). That arrangement allowed PTC to obtain the necessary funds to pay the remaining construction costs and to place the vessels in service by the end of the year, as required by tax regulations (Firm St. ¶ 19).

Before HGN and PTC completed their negotiations, HGN asked Farrell to issue an opinion confirming the sought-after tax consequences of the proposed transfer (Eisenberg Dep. 99, 116):

> I believe that we gave Mr. Farrell a series of opinions during the evening of Tuesday for him to review as opinions that would be required from his firm in connection with the safe harbor lease transaction.
>
> \*   \*   \*   \*   \*   \*
>
> I asked Mr. Farrell many, many questions about this transaction, and the whole series of tax issues that I perceived in this transaction. I wanted to adduce from Mr. Farrell his judgment as to the certainty with respect to each of the issues in the transaction.
>
> Mr. Farrell's oral statements to me were ultimately reflected in the form of an opinion to be issued by his firm, a clear unequivocal, unqualified opinion that the transaction qualified as a safe harbor

---

decided not to raise the merits of that issue at this time. Accordingly, solely for purposes of this motion, the Chamberlain firm has not contested the merits of HGN's fraud claims. For the same reason, the Chamberlain firm has not at this juncture contested the truth or credibility of testimony given in the San Diego action by HGN's "attorneys and agents" or other witnesses who [sic] the Chamberlain firm's litigation counsel have not as yet had an opportunity to cross-examine. The Chamberlain firm expressly reserves its right to contest such claims and evidence in the event the Court should deny this motion for summary judgment in whole or in part.

Rule 56 motions are supposed to be substitutes for trials where *no* material facts are in dispute (*Factofrance Heller v. I.P.M. Precision Machinery Co.,* 627 F.Supp. 1412, 1416 (N.D.Ill.1986)), not mere issue-narrowing devices such as a Rule 16 order might accomplish. That is why litigants cannot "hold back" on summary judgment mo-

tions (see, e.g., *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985)). Nevertheless, because the parties have spent so much time and money on the motions and because the issues *are* narrowed by eliminating the RICO claims, this Court has not sent the lawyers back to the drawing boards entirely—as it had every right to do.

4. To the extent the Firm-Farrell motions are accepted as Rule 56 motions (but see n. 3), the principles governing such motions impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—here HGN. *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (U.S. June 25, 1986).

lease transaction; that interest deductions would be available; depreciation deductions would be available; investment tax credit would be available, and all of the other matters reflected in his opinion. Farrell refused to sign the opinions drafted by HGN before closing the loan (Eisenberg Dep. 160). Instead he signed a cover letter that said (Complaint Ex. G):

> As we have discussed during our negotiations with your client in regard to a loan of $7,000,000, a Tax Benefit Lease Transaction between our respective clients is anticipated to be completed and executed prior to January 31, 1983. In that regard, our firm and your firm have drafted, in addition to the Loan Agreement which is being executed today, an Equipment Purchase and Lease Agreement which our client has contractually agreed to enter into. The Equipment Purchase and Lease Agreement requires certain opinions of counsel which we have discussed and reviewed with you and which are attached to this letter as Exhibit "A". We have no reason to believe that we will not be able to give the attached opinions, however, this letter should not be construed and is not an opinion on the points at this time.

HGN and PTC closed the Loan Agreement December 30, 1982 (Complaint Ex. B), secured by a "First Preferred Fleet Mortgage" (Complaint Ex. F) covering the four tuna fishing vessels. Loan Agreement ¶ 6.02(c) contained a liquidated damages provision:

> (c) The parties acknowledge that the principal purpose for the Loan transaction herein contemplated is to provide Borrower funds to enable it to have sufficient time to satisfy the conditions precedent to the tax benefit transactions referred to in Article V, and Lender is willing to make the Loan in anticipation of the benefits which will accrue to it under the TBT Agreements. Accordingly, in the event the transactions contemplated by Article V are not consummated on or before the TBT Closing Date for

any reason other than the breach or default by Lender, then Lender shall have suffered serious and substantial losses which will not be subject to accurate measurement. Accordingly, in addition to each of its remedies with respect to the Loan set forth above, Lender shall be entitled to an additional amount of $500,-000 as liquidated damages for the loss of the benefit of its bargain, and not as a penalty, and the payment thereof shall be deemed so much additional indebtedness of Borrower secured by the Fleet Mortgage. If liquidated damages become due and payable hereunder, the amount thereof shall be added to the principal amount of the Note effective on and as of February 1, 1983.

In January 1983 HGN learned it would not receive the insurance policy it required to proceed with the tax-benefit transaction (Eisenberg Dep. 151; Posner Dep. 117–18). On February 28 PTC paid the first interest installment due under the Loan Agreement (D. Ex. 15). On March 1 HGN declared the Loan Agreement and its accompanying security agreements in default (D. Ex. 17).

That same day HGN filed suit in the United States District Court for the Southern District of California against three of the tuna fishing vessels (as defendants in rem) and PTC (as a defendant in personam), seeking to recover both the $7 million loan principal and the $500,000 liquidated damages (D.Ex. 2). HGN did not join Firm, Farrell, Cenoz or Banpesca as defendants (D.Ex. 1). In May 1983 Banpesca intervened in HGN's San Diego action, suing the four tuna fishing vessels (in rem)[5] and HGN, Cenoz and PTC (in personam) (D.Exs. 1, 4).

On December 10, 1984 the San Diego court entered a final judgment in HGN's favor, awarding it the proceeds from the sale of the two seized vessels, the full liquidated damages amount, interest, attorneys' fees, costs and expenses, all totaling $8,860,719 (D.Exs. 1, 16). Banpesca won nothing on its complaint for intervention

---

5. HGN had caused two of the vessels to be seized (D. Ex. 16).

(*id.*). HGN eventually collected $6,443,772 on the San Diego judgment (D.Ex. 1).

### Firm-Farrell Summary Judgment Contentions

Firm and Farrell make four arguments in support of their summary judgment motions:

1. HGN's San Diego action bars this entire suit on res judicata grounds.

2. HGN has already won in its San Diego lawsuit the relief it seeks under Counts V and VII of this action.

3. HGN's RICO claims are barred by a two-year statute of limitations.

4. HGN cannot recover under Illinois law for Farrell's negligent misrepresentations.

Farrell also asserts the doctrine of unclean hands bars HGN's recovery here.

### Res Judicata

This Court recently discussed general res judicata principles in *Magnus Electronics, Inc. v. Argentine Republic*, 637 F.Supp. 487, 489–90, (N.D.Ill., 1986):

Res judicata principles encompass both "claim preclusion," which prohibits litigants from splitting a single cause of action into more than one proceeding, and "issue preclusion," which forbids litigants from relitigating issues actually resolved in an earlier proceeding. *Migra v. Warren City School District, Board of Education*, 465 U.S. 75, 77 n. 1 [104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56] (1984) thoroughly explains that terminology. Claim preclusion applies to bar theories that were or that could have been raised in the prior case, *Nevada v. United States*, 463 U.S. 110, 129–30 [103 S.Ct. 2906, 2917–18, 77 L.Ed.2d 509] (1983):

Simply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any

other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac*, 94 U.S. 351, 352 [4 Otto 351, 24 L.Ed. 195] (1877). The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever." *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).

Firm and Farrell essay to move beyond those basic principles to a variant of the more expansive doctrine announced in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Both the nature of the Firm-Farrell claim and also, as will become apparent, why it must fail are explained in *Betances v. Quiros*, 603 F.Supp. 201, 206–07 (D.P.R.1985) (emphasis in original; citations and footnotes omitted):

The nonmutual claim preclusion rule is an expansion of the *res judicata* doctrine that abandons the mutuality requirement as exclusive for limiting between which parties *res judicata* would be enforced. The rule applies in cases that, as in the instant case, (1) claim an identical cause of action as in a prior lawsuit; (2) a final judgment on the merits has been entered in the prior lawsuit; but, (3) include another defendant who was not previously named in that prior action nor is bound by the judgment thereunder....

The Supreme Court in *Blonder-Tongue*, acknowledging a new trend being followed by state and federal case law at the time concluded that the mutuality rule had been diminished as a strict requirement to determine whether a plaintiff's claim against one defendant is barred when such plaintiff had a prior fair and full chance to litigate the same claim against another defendant and lost.... The court in *Blonder-Tongue* held that if a plaintiff had such a full and fair chance, an adverse judgment against him would subsequently preclude his seeking redress against another defend-

ant for the same cause of action even if such other defendant was not bound by the prior judgment.... The questions of privity and mutuality lose significance to the idea that litigation should not be duplicative in cases when the same claims are brought against different defendants in different lawsuits if the plaintiff already had a full and fair chance to litigate his claim. Hence, in such instances, the courts have "enlarged the area of *res judicata* beyond any definable categories of privity between the defendants." ...

A leading decision permitting the nonmutual claim preclusion defense is the Third Circuit's decision in *Gambocz v. Yelencsics,* [468 F.2d 837 (3d Cir. 1972)].... In *Gambocz,* the Third Circuit followed its prior decision in *Bruszewski,* [*v. United States,* 181 F.2d 419 (3d Cir.), *cert. denied,* 340 U.S. 865 [71 S.Ct. 87, 95 L.Ed. 632 (1950)]] (as explained in *Blonder-Tongue*), and applied the rule to a situation similar to the case at bar. There, in a civil rights action under Sections 1983 and 1985, the Third Circuit stated that *"res judicata* may be invoked against a plaintiff who has previously asserted essentially the same claim against different defendants where there is a *close or significant relationship between successive defendants."* ...

The court in *Gambocz* added that the nonmutual *res judicata* plea "grows out of the fact that the bar of the prior adjudication is not interposed directly, by parties to the prior suit, but indirectly, *by new defendants,* strangers to the earlier action." ...

The court in *Gambocz* rejected to categorize the plea as being in the nature of collateral estoppel because such terminology is more properly used in situations where the prior adjudication, on the merits, decided "issues" actually litigated.... Since the situation in *Gambocz* precluded the relitigation of an identical "claim", the court concluded that the nonmutual plea was a variant of the general *res judicata* doctrine operating to bar the relitigation of an identical "cause of action." ...

Firm-Farrell say (1) this lawsuit presents the same "cause of action" as HGN's San Diego action and (2) HGN had "a full and fair chance" to litigate that cause of action in San Diego. Accordingly they insist HGN should have asserted its claims against Firm and Farrell in that lawsuit and cannot pursue them here.

HGN (though its Mem. 14 n. 7 concedes it obtained a final judgment on the merits in the San Diego action) responds with a battery of its own arguments:

1. Nonmutual claim preclusion should not bar a previously *successful* plaintiff from pursuing additional defendants.

2. HGN's current claims do not form part of the same "cause of action" as its San Diego lawsuit.

3. HGN did not have enough information to advance its current claims when it first filed its San Diego lawsuit.

4. HGN could not have obtained personal jurisdiction over Firm or Farrell in the San Diego district court.

Because the first of those contentions is a winner, the others need not be addressed.

In that first argument, HGN simply says there is nothing to stop a plaintiff who won its first lawsuit from filing a later one suing other defendants. In response Firm-Farrell claim to invoke traditional res judicata principles (the law of merger) holding a judgment for the plaintiff extinguishes his claim (see Restatement (Second) of Judgments ("Restatement") § 18 (1980)).

But as the *Betances* quotation reflects, *Blonder-Tongue* and its progeny teach only that a plaintiff who sues one defendant and *loses* cannot later assert the same claim against another defendant.[6] Were

---

**6.** Firm-Farrell cite *Cambist Films, Inc. v. Duggan,* 475 F.2d 887 (3d Cir.1973) (per curiam) to argue defendants not named in the first lawsuit can use claim preclusion to bar a successful plaintiff's second lawsuit. But *Cambist* af-firmed the district court's dismissal of the second lawsuit on qualified immunity grounds. Though the concurring opinion (*id.* at 890–91) did call upon res judicata notions as a basis for dismissal of the second complaint as to the new

that not so, a plaintiff (like a patient going from doctor to doctor until he or she finds one who does not concur in the original unfavorable diagnosis) could simply keep shopping for a sympathetic judicial ear. *Blonder-Tongue*, 402 U.S. at 329, 91 S.Ct. at 1443 put it well:

> Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or "a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure."

■ When a plaintiff sues and *wins*, however, the rule of merger relied on by Firm-Farrell says only that plaintiff cannot bring another action on the same claim against the *same* defendant. Where the first lawsuit has decided plaintiff has a valid cause of action, there is no reason such upholding of that claim should limit plaintiff's ability to assert it against *other* defendants. And that is precisely what Restatement § 49 (cited by neither set of lawyers here) says:

> A judgment against one person liable for a loss does not terminate a claim that the injured party may have against another person who may be liable therefor.

Thus *Gill and Duffus Services, Inc. v. Islam*, 675 F.2d 404, 404–05, 407 (D.C.Cir. 1982) (per curiam) (emphasis in original; citations and footnotes omitted) held that a commodity broker's judgment against one of three persons liable for its loss did not terminate its claim against the other two persons:

> Appellant claims a loss suffered as a result of the actions of three "associated" persons. The district court held that under the doctrine of res judicata a judgment *in favor of* appellant against one of those persons, even though unsatisfied, foreclosed a second action against the others. The district court misperceived preclusion doctrine. An unsatisfied judgment against one of two or more persons

answerable for an injury or on an obligation generally does not bar further litigation. As a rule, "[t]he rendition of a judgment against one of two or more persons liable for a loss does not terminate a claim that the injured party may have against any other person who may be liable therefor."

\*  \*  \*  \*  \*  \*

Without regard to any notion of "privity," had Gill and Duffus lost the Virginia action against [the first defendant, the second set of defendants] might properly have invoked that defeat to preclude relitigation of issues *decided adversely to* Gill and Duffus. For it is the general rule that a party defeated on the merits in a first action is thereby precluded from relitigating issues raised and necessarily decided in that action. The preclusion operates not only in favor of the opposing party in the first action, it encompasses as well persons who had no part in that adjudication.... But Gill and Duffus *prevailed* in Virginia. Joinder of [the second set of defendants] in that action was permissive, not mandatory. *See* Fed.R.Civ.P. 20(a). Double recovery is surely foreclosed.... Only one satisfaction may be obtained for a loss that is the subject of two or more judgments.... Nor may Gill and Duffus try again on an issue, to the extent that it was determined against them in the Virginia action; for example, the amount due on the account was established by the jury verdict to be $176,185.80, not the $239,035.80 demanded in the complaint.... Further, Gill and Duffus may be precluded from taking inconsistent positions in the two actions.... Subject to such constraints, however, the doctrine of res judicata is not a barrier to the maintenance of the Gill and Duffus suit against [the second set of defendants].

■ Restatement § 49 and *Gill and Duffus* are on all fours with this case. Here too HGN prevailed in its first (the

---

defendants, it did not discuss at all the different considerations affecting losing and prevailing

plaintiffs. It is simply wrong analytically, and this Court will not follow it.

San Diego) action. It remains free to sue Firm and Farrell. Their res judicata argument is empty.

*Damages under Counts V and VII*

In its San Diego action HGN was awarded a judgment for (D.Ex. 16):

1. $3,500,000 of the $7 million loan principal;

2. an additional 20% of that sum under 46 U.S.C. § 922(f);

3. the full $500,000 liquidated damages amount;

4. interest; and

5. attorneys' fees, costs and expenses.

Complaint Counts V and VII here seek similar kinds of relief (Complaint ¶¶ 100, 111):

... HGN suffered the following damages: (a) Seven Million Dollars ($7,000,000) in principal on the loan; (b) all interest due and owing to date on said loan; (c) the inability to claim a ten percent (10%) investment tax credit and ACRS depreciation deducations with regard to property having a federal income tax basis of Forty Eight Million dollars ($48,000,000) as anticipated from the Safe Harbor Lease; (d) legal fees and expenses incurred in attempting to enforce its rights under the loan and/or foreclose on the First Preferred Fleet Mortgage; and (e) all costs and expenses incurred herein.

Firm seeks summary judgment as to those Counts, stating HGN has already recovered in the San Diego action the damages it seeks here.

■ *Gill and Duffus* tells why that notion must be rejected as to the $7 million loan principal. Of course HGN cannot have a double recovery. But the San Diego judgment awarded HGN only half the $7 million loan principal (D.Exs. 1 and 16).[7]

HGN is entitled to seek the remainder of that amount in this action.

Firm-Farrell also contend HGN's attempt in this action to recover the loss of its anticipated tax benefits is equivalent to its earlier (and successful) demand for liquidated damages under Loan Agreement ¶ 6.02(c). To that end Firm-Farrell point to the San Diego court's Finding of Fact 22 and Conclusion of Law 10 (D.Ex. 16):

22. At the time the loan was negotiated, HGN and PTC agreed that in the event that the specific tax benefit agreement was not consummated, it would be difficult to determine the damages suffered by HGN and that the sum of $500,000.00 would be fair and reasonable damages considering all of the factors involved.

\* \* \* \* \* \*

10. The liquidated damages provision in the loan agreement between HGN and PTC is a valid liquidated damages provision and was a reasonable pre-estimate by the parties of the damages, uncertain in amount, which HGN would suffer if the contemplated tax benefit agreement were not consummated.

Because the full liquidated damages amount was included in the San Diego judgment, Firm-Farrell say that forecloses any further recovery of damages for HGN's lost tax benefits.

That purposefully overlooks the gravamen of HGN's current claims, which sound in fraud. HGN's recovery of liquidated damages arose out of its lawsuit for breach of the Loan Agreement, which entitled HGN only to its contract measure of damages. Because HGN and PTC had contractually agreed in advance on a specific liquidated damages amount as a substitute for HGN's actual damages, HGN could not recover more than that fixed amount when PTC breached the Loan Agreement.

---

7. This lawsuit is not an effort, as discussed at the end of the *Gill and Duffus* quotation, to "try again on an issue, to the extent it was determined against [HGN] in the [San Diego] action." From the papers submitted on the current motion, the $3.5 million judgment in San Diego

was occasioned by the fact that each of the four vessels secured $1.75 million of the $7 million principal amount, and only two vessels were seized and sold there. It was *not* determined HGN's total principal claim was $3.5 million rather than $7 million.

■ But here HGN sues in tort, and different rules of law govern its potential recovery under its tort theories. *Martin v. Allstate Insurance Co.*, 92 Ill.App.3d 829, 835, 48 Ill.Dec. 316, 221, 416 N.E.2d 347, 352 (1st Dist.1981) (citations omitted) sets out the measure of damages for HGN's fraud claim:

> The measure of damages in an action for fraud is determined from the loss to the plaintiff rather than from the gain to the defendant.... The rationale which underlies this so-called benefit of the bargain rule is that the defrauded party is entitled to be placed in the same financial position as he would have been in had the misrepresentations in fact been true.... As stated in 19 Ill.L. & Prac. *Fraud* § 53 (1956):
>
>> "Generally, the measure of damages for fraud is such an amount as will compensate the plaintiff for the loss occasioned by the fraud, or, as it has been expressed, the amount which plaintiff is actually out of pocket by reason of the transaction."
>
> However, damages may not be predicated on mere speculation ... and must be a proximate, and not a remote, consequence of the fraud....

HGN can recover the entire loss occasioned by the Firm-Farrell fraud. That measure of damages is not automatically controlled by Agreement's liquidated damages provision. See *Havoco of America, Ltd. v. Hilco, Inc.*, 731 F.2d 1282, 1290 n. 7 (7th Cir.1984).

Again HGN cannot recover twice for the same loss. To the extent the already-received liquidated damages apply to the same injury for which HGN seeks recovery here, such recovery must be reduced. See Restatement § 50(2). But that rule against double recovery does not mandate outright dismissal of HGN's claims.[8] Accordingly the Firm-Farrell global attack on the damages sought in Counts V and VII also fails.

### RICO's Limitations Period

■ Next Firm-Farrell assert HGN's RICO claims are barred by Illinois' two-year statute of limitations governing statutory penalties (Ill.Rev.Stat. ch. 110, ¶ 13–202). HGN Mem. 28–35 argues for either (a) Illinois' five-year limitations period for fraud (Ill.Rev.Stat. ch. 110, ¶ 13–205) or (b) the four-year limitations period of the Clayton Act (15 U.S.C. § 15). This Court, though it had previously issued oral rulings to the same effect in several civil RICO cases, has just "gone public" in favor of the two-year statute in *Grasemann v. Rosenfeld*, 642 F.Supp. 338, 340 (N.D.Ill. 1986) (footnote omitted):

> Though differing views exist as to the limitations period for Illinois-based RICO claims (see the LEXIS–available opinion in *Fink v. Meserve, Mumper & Hughes*, No. 84 C 10382, slip op. (N.D.Ill. June 19, 1986) [Available on WESTLAW, DCTU database]), this Court agrees (as did its colleague Judge Prentice Marshall in *Fink*) with the analysis of its other colleague Judge William Hart as expressed in *Electronic Relays (India) Pvt. Ltd. v. Pascente*, 610 F.Supp. 648 (N.D.Ill.1985): Two years is the time within which such claims must be sued upon.

HGN filed its Complaint September 18, 1985. It had closed the Loan Agreement December 30, 1982. Firm-Farrell's allegedly fraudulent misrepresentations during negotiation of the Loan Agreement necessarily preceded that date. On their face, then, HGN's RICO claims are barred by limitations.

HGN's first salvage effort to avoid that result is to claim a "continuing conspiracy" between the defendants to violate RICO. It contends the limitations period begins to

---

**8.** On a good many of the issues dealt with in this opinion, the parties' submissions (bulky though they are) do not cover nearly all the bases. One thing they have not focused on adequately (see Firm Mem. 53–54, not really dealt with by HGN), and to which this opinion does not purport to provide an answer, is the question whether (and in what manner) the contractual liquidated damages provision may be admissible as *evidence* in determining the fraud damages claim.

run from the last overt act of the conspiracy. See *Newman v. Wanlund,* No. 85 C 2265, slip op. at 2 (N.D.Ill. Mar. 6, 1986) [Available on WESTLAW, DCTU database]. HGN says that happened in January 1984 when Banpesca bought two of the tuna fishing vessels for the minimum bid price through its shell corporation, International Shipping Vessels, Inc. (Complaint ¶ 73; D.Ex. 1).

That makes no sense at all. When someone is a target of a continuing conspiracy (assumed arguendo here), its cause of action is triggered ("accrues") when it sustains harm—when it has been damaged (see, e.g., *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 669 F.2d 490, 494 (7th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982)). That is when the limitations time-clock begins to tick. *Baldwin v. Loew's, Inc.,* 312 F.2d 387, 390 (7th Cir.1963). At the latest, HGN's damages arose when the tax-benefit transfer fell through January 31, 1983—more than two years before HGN filed its Complaint.

HGN also claims it did not "discover" Banpesca's attempts to frustrate HGN's liens on the tuna fishing vessels until it conducted discovery in the fall of 1983 (Minteer Aff. ¶ 8). HGN says its late discovery of Banpesca's actions should toll the statute of limitations.

But Banpesca intervened in HGN's San Diego action in May 1983. HGN itself (Complaint ¶ 69) characterizes that as Banpesca's first attempt to frustrate HGN's liens. On its own allegations HGN then knew (or at a minimum should have known) of Banpesca's alleged scheme to defraud it. That is not the stuff of which tolling is made.

HGN's RICO claims are plainly time-barred. Counts I through IV are dismissed.

### Farrell's Negligent Misrepresentations

Count VII alleges Farrell negligently breached his duty to HGN to render accurate legal advice as to whether the tuna fishing vessels would qualify for a tax-benefit transfer. Firm-Farrell characterize that Count as a claim for legal malpractice, then argue nonclient HGN cannot sue a third party's attorney for the reasons expressed in *Pelham v. Griesheimer,* 92 Ill.2d 13, 19–21, 64 Ill.Dec. 544, 547–548, 440 N.E.2d 96, 99–100 (1982) (citations omitted):

> The traditional, general rule has been that the attorney is liable only to his client, not to third persons.... The concept of privity has long protected attorneys from malpractice claims by nonclients. We note that several Illinois cases have refused to extend the obligations of an attorney to nonclient third parties.
>
> \*   \*   \*   \*   \*   \*
>
> In the area of legal malpractice the attorney's obligations to his client must remain paramount. In such cases the best approach is that the plaintiffs must allege and prove facts demonstrating that they are in the nature of third-party intended beneficiaries of the relationship between the client and the attorney in order to recover in tort.... By this we mean that to establish a duty owed by the defendant attorney to the nonclient the nonclient must allege and prove that the intent of the client to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship....
>
> Analogizing the scope of the duty to the concept of a third-party direct beneficiary serves the purpose of limiting the scope of the duty owed by an attorney to nonclients. The key consideration is the attorney's acting at the direction of or on behalf of the client to benefit or influence a third party.... We conclude that, for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party. Under such proof, recovery may be allowed, provided that the other elements of a negligence cause of action can be proved.

Because Farrell's representation of PTC in the negotiations was not "intended" to benefit HGN, Farrell is said to have owed no "duty" to HGN, which thus cannot recover for Farrell's negligence.

■ But that mischaracterizes the nature of HGN's claim. It does not sue on the attorney-client relationship between Farrell and PTC, seeking recovery for Farrell's negligent failure to represent PTC adequately during the negotiations. On the contrary, HGN sues for negligent misstatements Farrell made directly *to HGN.* That claim states a cause of action for negligent misrepresentation under Illinois law. *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Ill.App.3d 75, 81, 24 Ill.Dec. 464, 469, 385 N.E.2d 376, 381 (3d Dist.1979).

Firm-Farrell's reliance on *Pelham* simply misses the mark. Count VII survives its motion for summary judgment.

### Unclean Hands Doctrine

Farrell alone calls on the doctrine of unclean hands, articulated in *Great Western Cities, Inc. v. Binstein,* 476 F.Supp. 827, 832 (N.D.Ill.1979) (citations omitted), to bar HGN from recovery:

> The doctrine of unclean hands prevents a court of equity from granting relief to a plaintiff whose conduct has been unconscionable or tainted with bad faith.... Thus, a court may deny equitable relief if the applicant is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought in connection with the transaction under consideration.

Unclean hands also applies to damage actions. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 506 F.Supp. 1127, 1137 (N.D.Ill.1981), *rev'd,* 214 U.S.P.Q. 409, *cert. denied,* 459 U.S. 859, 103 S.Ct 131, 74 L.Ed.2d 113 (1982).

Farrell advances a host of arguments in this area. None is worth the time it has taken to read, research and write about any or all of them.

First, Farrell Mem. 20 says HGN should have asserted its claims against Farrell in its San Diego lawsuit (an echo of the non-mutual claim preclusion argument already turned down in this opinion). HGN is somehow said to be guilty of unclean hands for having filed a "duplicative" action here. Simply to state that position is enough to reject it.

Second, Farrell says HGN knew the tuna fishing vessels could not be placed in service by December 31, 1982. That meant HGN never actually relied on Farrell's alleged representations the vessels would qualify for a tax-benefit transfer. In turn that would render HGN's claim of reliance inherently unbelievable, so its assertion of that claim would constitute inequitable conduct.

For that purpose Farrell relies on Eisenberg's statements (Eisenberg Dep. 162–64) he knew two of the vessels required additional equipment before they could be placed in service. But Farrell impermissibly distorts the thrust of Eisenberg's testimony. Eisenberg flatly says Farrell told him the vessels would have all the equipment necessary to place them in service by December 31, 1982 (*id.* at 162–63, 164–65):

> A. My understanding was that the vessels were complete in all respects; that the two vessels in Vancouver had been fully completed, properly stored. That all necessary items required to enable the vessels to travel to the Pacific to fish had been completed.
>
> That the two vessels in Alabama required additional items, skiffs, purseine [sic] nets, et cetera, stores, gasoline, funds to hire the crews, et cetera. But that the vessels themselves were fully complete and ready to go, and that the only concern is whether these additional items could be acquired and put on board the vessels in order to cause the vessels to be placed in service, for federal income tax purposes, prior to December 31, 1982.
>
> When the discussions began with Mr. Farrell, he represented that these steps were being taken; that he was fully confident that these vessels would be com-

plete, and ready to be placed in service prior to December 31.

Q. What did Mr. Farrell—I am sorry.

A. I am sorry, what was—well, I believe that I had a discussion with Mr. Farrell shortly after the first of the year in which I asked Mr. Farrell to confirm that these things had happened.

And my recollection is that he did confirm that all of the matters had been discussed prior to the funding of the loan had taken place, and that the vessels were on their way to San Diego for rendezvous with the vessels from Vancouver in preparation for a fishing trip to the Pacific.

\*    \*    \*    \*    \*    \*

Q. Did Mr. Farrell indicate that the vessel would be or could be placed in service before the end of 1982 without a net?

A. I don't recall a specific discussion on that. And I don't recall—frankly I don't recall specifically whether I was told that the net would be supplied in San Diego or it would be supplied in Alabama.

I can tell you that I received from Mr. Farrell, without equivocation, 100 percent certainty, his opinion that the vessels would be placed in service prior to December 31, 1982.

And Connolly Dep. 177–78 (also relied on by Farrell) simply indicates he thought the vessels could be placed in service notwithstanding the lack of some items of equipment ("What I am saying, I believe, is that there was some element of concern, but I was satisfied," *id.* at 178). Farrell has not shown HGN did not in fact rely on his representations in that area.

Farrell also says HGN knew it might encounter difficulty in transferring the loan funds to the shipyards in time to put the vessels in service before the end of 1982 (Connolly Dep. 100–01):

Q. What arrangements—while we are on this subject, what arrangements did HGN make to be certain that the funds from the HGN loan would be actually used to pay Bel-Aire?

A. I did not make those arrangements. My understanding is that there were con- versations between representatives of HGN and Bel-Aire, and that the original idea was that we would wire transfer funds to Bel-Aire directly from the closing, but for some reason, of which I am not certain, the Canadian bank in Vancouver could not accept a wire transfer on that particular day, or was not able to accept a wire transfer generally, and Bel-Aire agreed, or suggested it, as I understand it, that the money be paid to Pacific Tuna Corporation in the transfer being made to Cielo Vista Bank, and that they would get paid out of those funds by Pacific Tuna, that it was acceptable for them to be paid for those out of those funds directly.

But the fact HGN knew of potential problems in implementing the transaction does not negate its reliance on Farrell's statements that the deal would work out. Farrell has not shown HGN knew all along the deal would fall through.

■ In sum, none of Farrell's arguments as to HGN's bad-faith assertion of its reliance claim is persuasive. Once more Farrell has come up empty.

Third, Farrell says he never assured HGN the vessels would qualify for a tax-benefit transfer. Farrell points out HGN Mem. 7 (relying on Farrell Dep. 300–01) says Farrell agreed to verify—after the Loan Agreement closed—that the vessels had been placed in service. Farrell insists HGN's current assertion that it relied on statements he made *before* the closing fatally contradicts its admission Farrell agreed only to verify certain facts after the closing.

That argument too distorts HGN's position. HGN Mem. 7 does not claim Farrell agreed *only* to verify the in-service requirement. Rather HGN Mem. 6–7 says Farrell told HGN the vessels would qualify for a tax-benefit transfer and *also* told HGN he would verify the in-service requirement. Those assertions are not inconsistent. HGN's claim of having relied on statements Farrell made before the closing is not meritless on its face.

Fourth, Farrell focuses on HGN's allegation Banpesca claimed an interest in the tuna fishing vessels (Complaint ¶ 69). HGN also alleges Farrell knew of that but did not disclose it to HGN (*id.* ¶ 62). Farrell points out he testified in his deposition (relied on by HGN in the San Diego litigation) that he had a "good faith belief" HGN's lien was valid (Farrell Dep. 317–18).

From that combination of factors, Farrell R. Mem. 15 draws the conclusion HGN's position in this lawsuit is inconsistent with HGN's argument in its San Diego lawsuit that Banpesca had no such liens. According to Farrell that inconsistency shows HGN's bad faith and requires dismissal of this lawsuit under the unclean hands doctrine.

As with Farrell's other arguments, that too wholly lacks merit. Banpesca intervened in the San Diego action to assert a lien on the four vessels. Of course HGN disputed the validity of that lien, and indeed HGN's own lien prevailed over Banpesca's claim (D.Ex. 16). HGN's assertion here that Banpesca *claimed* a lien is in no way inconsistent with HGN's earlier contest of the validity of that claimed lien.

Finally, Farrell says HGN has "distorted" the terms of the Loan Agreement by saying (HGN Mem. 5 n. 5):

In fact, had PTC performed all of its obligations, HGN was bound to convert the loan.

Farrell points out Equipment Purchase and Lease Agreement ¶ 3.1 required PTC to deliver certain documents "in form and substance satisfactory to counsel for Buyer." Farrell says that language reserved to HGN the right to reject the documents and refuse to close the deal for any reason. According to Farrell Mem. 19, HGN's contrary assertion here grossly distorts the Loan Agreement's language and evidences HGN's unclean hands.

If the assertion of erroneous legal doctrines were enough to trigger the unclean hands doctrine, Farrell himself would be in deep trouble. He is flat-out wrong as a matter of law in saying HGN could reject out of hand the documents tendered by PTC. *Forman v. Benson,* 112 Ill.App.3d 1070, 1074–75, 68 Ill.Dec. 629, 446 N.E.2d 535, 538–39 (2d Dist.1983) (citations omitted) summarizes Illinois law as to "satisfaction" clauses:

[T]here is some Illinois case law regarding the interpretation of "satisfaction" clauses in general. In *Reeves & Co. v. Chandler* (1903), 113 Ill.App. 167, 170, the court found that satisfaction clauses generally fall into one of two classes. In one class, the decision as to whether a party is satisfied is completely reserved to the party for whose benefit the clause is inserted, and the reasons for his decision may not be inquired into and overhauled by either the other party or the courts. Cases falling into this class generally involve matters which are dependent upon the feelings, taste, or judgment of the party making the decision.... The second class of cases are those in which the party to be satisfied is to base his determination on grounds which are just and reasonable.... These cases generally involve matters which are capable of objective evaluation, or which involve considerations of operative fitness or mechanical utility.... Matters of financial concern generally fall into this second category of cases.... The adequacy of the grounds of a determination in this class are open to judicial scrutiny and are judged by a reasonable man standard.

Indeed, even under the plainly inapplicable personal judgment standard, *Forman, id.* at 1077, 446 N.E.2d at 540 makes clear HGN could not have acted capriciously:

The personal judgment standard, however, does not allow the defendant to exercise unbridled discretion in rejecting plaintiff's credit, but rather is subject to the requirement of good faith.

■ HGN therefore *did* have an obligation to convert the Loan Agreement to a tax-benefit transfer on PTC's performance of its own obligations (see Loan Agreement §§ 5.01–5.04). HGN's brief does not distort that obligation and does not show bad

faith in presenting its arguments to this Court.

Farrell would have been better advised not to raise the spectre of unclean hands (not, at least, without some examination of his own hands in having done so). None of his arguments bears scrutiny.

### *Conclusion*

There is no genuine issue of material fact, and Firm and Farrell are entitled to judgment as a matter of law, as to HGN's RICO claims (Counts I–IV). Those counts are dismissed. In all other respects the Firm-Farrell motions are denied.

This action has lain fallow all too long (at Firm-Farrell's behest, discovery was stayed pending briefing on what they characterized as potentially dispositive motions). To put the lawsuit back on a fast track:

1. Firm and Farrell are ordered to answer the Complaint on or before September 12, 1986.

2. Each of the parties is ordered to file, on or before September 19, 1986, a Rule 26(f) statement outlining in summary form a contemplated discovery plan and possible schedule.

3. This action is set for a status hearing September 24, 1986 at 9 a.m.