(No. 95876.—

EARLEAN JINKINS, Indiv. and as Adm'r of the
Estate of George Jinkins, Deceased, Appellee, v.
DR. CHOONG LEE *et al.*, Appellants.

*Opinion filed March 18, 2004.*

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Paul Racette, Assistant Attorney General, of Chicago, of counsel), for appellants.

Marvin A. Brustin, Milo W. Lundblad and Matthew S. Knorr, of Chicago, for appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

In this case we consider whether the doctrine of sovereign immunity bars plaintiff's claim for negligence against mental health professionals. Plaintiff, Earlean Jinkins (Earlean), filed her complaint individually and as administrator of the estate of George Jinkins (George), her husband, against the defendants Dr. Choong Lee and Paullette Medlin, employees of the John J. Madden Mental Health Center (Madden Center). Plaintiff alleges that defendants failed to properly diagnose and treat George's mental illness, such that George should have been subject to involuntary commitment. This failure, plaintiff alleges, led to George's release from Madden Center and subsequent suicide. The appellate court found that the claim survived. 337 Ill. App. 3d 403. For the following reasons, we affirm the appellate court.

## BACKGROUND

George resided with his wife, Earlean, and other family members in Chicago. George began acting abnormally three or four months prior to his suicide. Earlean and their children moved out of the residence when, according to Lorenzo Norwood, a lifelong friend and neighbor, George "told her to get out of the house, go live with her mother, because he didn't want her to be there with him or there would be—instead of one body bag, there'd be two bodies. So she left." George began drinking heavily, was dressing in a dirty and disheveled manner, and was giving away his money and possessions. Norwood also

saw George running in front of cars "maybe three or four times." Norwood stated that George did not drink before he started "acting funny," other than "when he went to the clubs, he'd have a beer. That's about it." George did not complain about his condition, but "he just started saying, things going to change."

On June 20, 1996, neighbors found George "laying in a puddle of muddy water face first" with his pants down. The neighbors brought George back to his house, where he still had his pants down; his underwear was bloody because he was bleeding from his rectal area. After George again attempted to run in front of a car, Norwood, a neighbor named Maurice Abernathy, and George's mother took George to Christ Hospital, a private hospital, in Oak Lawn at approximately 7 p.m.

Dr. Daniel Sachs, a resident in emergency medicine at Christ Hospital, treated George in the hospital emergency room. He diagnosed George with "acute psychosis with suicidal behavior," hemorrhoids, and constipation. His blood-alcohol content was 0.203 and he also tested positive for marijuana. Dr. Sachs stated his diagnosis of psychosis was based on the information, related by Norwood or Abernathy, that George walked in front of cars intentionally, George's statements to them that he "just wants to go," and George's mother's statement that George had been suicidal during the previous three weeks. George's mother told Dr. Sachs that George thought he was being poisoned and that when she cooked George would stand over her to watch if she poisoned the food. Dr. Sachs disbelieved George's denial that he was suicidal. According to a Christ Hospital social worker, Earlean arrived at the hospital later in the evening and stated that George's behavior was due to alcohol abuse.

Dr. Sachs' "plan was to have him evaluated and possibly admitted by a psychiatrist." Dr. Sachs explained, "My responsibility was to decide what the patient's

disposition should be—is he safe to go home, or does he need an evaluation of possible admission—but not to decide where that should take place." The decision as to where he would be admitted, whether it was Christ Hospital or another hospital, "was an administrative issue rather than a doctor issue," according to Dr. Sachs. The administrative decision belonged to a licensed clinical social worker at Christ Hospital, Leonard Kemp.

Kemp filled out a petition asserting that George was subject to involuntary admission pursuant to section 3—601 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3—601 (West 1996) (providing "[w]hen a person is asserted to be subject to involuntary admission and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm, any person 18 years of age or older may present a petition to the facility director of a mental health facility")). The Code defines a "[p]erson subject to involuntary admission" as "[a] person with mental illness and who because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another person in the near future." 405 ILCS 5/1—119 (West 1996). Kemp and George's mother signed the petition, and George's mother and Abernathy were listed as witnesses. The petition stated that George was "a person who is mentally ill and who because of his *** illness is reasonably expected to inflict serious physical harm upon himself *** or others in the near future." George was "in need of immediate hospitalization for the prevention of such harm," in that "George has been hearing noises and voices, thinking he is being shot at, that birds are talking to him, that he has been poisoned. He has been running in front of cars trying to kill himself."

Dr. Sachs prepared a certificate accompanying the petition pursuant to section 3—602 of the Code (405

ILCS 5/3—602 (West 1996) (stating that "[t]he petition shall be accompanied by a certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization")). The certificate stated that Dr. Sachs had examined George, and that based on the examination, George was "a person who is mentally ill and because of his *** illness is reasonably expected to inflict serious physical harm on *** [him]self or another in the near future." Dr. Sachs wrote in the certificate that the "patient's mother and two brothers [sic] say that he has repeatedly tried to kill himself by walking into street in front of cars. He tells them, 'I just want to go.' "

George was held overnight at Christ Hospital. George was disruptive and given 10 milligrams of Haldol at approximately 11:45 p.m. At approximately 3 a.m. the next day, George attempted to escape the hospital, but was found by hospital security in a nearby car dealership lot and returned to Christ Hospital. At approximately 6 a.m. that same day, after his blood-alcohol content had decreased below 0.10, George was transferred in restraints by ambulance to Madden Center, a mental health care facility operated by the Illinois Department of Human Services (see 20 ILCS 1705/4 (West 2002)). Dr. Sachs believed that Christ Hospital may have transferred George to Madden Center because George lacked insurance. Dr. Sachs spoke on the telephone with Dr. Hasina Javed, the intake psychiatrist who worked the shift prior to defendant, Dr. Lee, regarding George.

Dr. Choong Lee, a board-certified psychiatrist, was the "intake psychiatrist" at Madden Center. Dr. Lee examined George pursuant to section 3—610 of the Code (405 ILCS 5/3—610 (West 1996) (providing that within "24 hours, excluding Saturdays, Sundays and holidays, after admission of a respondent pursuant to this Article,

the respondent shall be examined by a psychiatrist" who, "shall not be the person who executed the first certificate. If the respondent is not examined or if the psychiatrist does not execute a certificate pursuant to section 3—602, the respondent shall be released forthwith")). In his deposition, Dr. Lee testified that intake psychiatry is not a specialized role, but that "intake psychiatry is only in our state hospital. I don't think any other place, a private hospital has such an intake psychiatry position." Dr. Lee stated that he decided if a patient required hospitalization or needed outpatient or other care, but he was not responsible for the subsequent treatment of the patients at Madden Center. As to the decision to admit a particular patient, Dr. Lee stated, "[t]hat is totally a clinical decision after the intake psychiatrist reviews the record, talks with the patient, and talks with the family, and gets the collateral information."

Paulette Medlin is a licensed clinical professional counselor and holds a master's degree in rehabilitation counseling. She held the position of "psychologist three" at Madden Center. She works in "intake, and her job is to gather information towards an evaluation of persons presenting to intake for admission or non-admission to the hospital." Medlin stated that she was to assist Dr. Lee, but the final decision as to involuntary admission of a patient belonged to Dr. Lee.

Dr. Lee reviewed Christ Hospital's paperwork. He and Medlin spoke with George and his wife for 30 to 45 minutes. Dr. Lee and Medlin then spoke to George and his mother separately for 5 or 10 minutes. According to Dr. Lee, Earlean disputed the contents of the petition for involuntary admission, stated that George was not suicidal, and told Dr. Lee that she wanted to take George home. Dr. Lee stated that despite George's denial of the events recounted in the petition, Dr. Lee assumed that the events had actually happened.

Dr. Lee's diagnosis of George was "alcohol related disorder, NOS [not otherwise specified]" and alcohol abuse. Dr. Lee did not believe that George was suicidal, but instead that there was some low risk of suicide because of the alcohol and drug use. Dr. Lee said the suicide risk was lower because of the family support. He admitted, however, this opinion would have changed if he had known that Earlean had left George three weeks prior to the examination. Dr. Lee also did not think George was suicidal because "he didn't have a past suicide attempt either and didn't have any history prior of psychiatric hospitalization." Dr. Lee thought that drugs and alcohol were the primary causes of the psychiatric symptoms, but he was not able to rule out other causes. Dr. Lee disagreed with Dr. Sachs' diagnosis, and opined that George's use of alcohol influenced Dr. Sachs' opinion. As to whether George should have been admitted, Dr. Lee stated, "at the time he was not certifiable, so that's why I didn't admit him." George had a right to go home because he was not "certifiable."

Dr. Lee admitted that a doctor-patient relationship existed between himself and George during the intake procedure. If the wife or his mother had requested admission, Dr. Lee stated, "probably I'd have to admit the patient." Dr. Lee and Medlin referred George to a community health center for outpatient treatment. Medlin's report stated that George refused the referral and that he wanted to seek help for himself.

George left Madden Center with Earlean and his mother that same morning and went home. Soon after arriving home, he shot himself in the head. His family took George back to Christ Hospital, where he died.

Dr. Syed Ali, a psychiatrist and expert witness for defendants, testified in his deposition that he had worked both in private practice and for the state. As part of his duties at the Illinois State Psychiatric Institute, he was

responsible for making determinations as to whether or not patients should be admitted. Some of these patients were referrals from emergency rooms with a petition for involuntary commitment. He testified that there is "absolutely" no difference in procedures, standards, or processes in involuntary commitment of patients between a private hospital and a state hospital. An identical standard of care is applicable to both private and state hospitals. Dr. Ali stated that Dr. Lee attributed the prior suicide attempts to alcohol abuse and that withdrawal from alcohol could have made George suicidal. "Alcoholic psychosis is more prevalent when there is alcohol withdrawal rather than in alcohol intoxication," according to Dr. Ali. Other diagnoses could be "schizophrenia" and "manic depressive illness."

Dr. Ali stated that once George arrived at Madden Center, Dr. Lee could have kept George for 24 hours, unless there were no grounds to hold the individual in the eyes of the examiner. Dr. Ali believed George would have benefitted from "staying longer at Madden and should have stayed at Madden longer and be admitted there." However, the issue facing Dr. Lee was whether George was "certifiable" such that he was subject to involuntary admission. The threshold for "certifiability," according to Dr. Ali, is "imminent risk" of suicide, which requires a high degree of probability.

Earlean, individually and as the administrator of George's estate, filed a 12-count complaint, and among the defendants named were two state employees, Dr. Lee and Paulette Medlin.[1] The complaint, consisting of counts for wrongful death and survival, charged defendants with

---

[1]Earlean's complaint also named as defendants Christ Hospital and parties affiliated with it. The circuit court granted summary judgment as to these private defendants, and the appellate court affirmed. *Jinkins v. Evangelical Hospitals Corp.*, 336 Ill. App. 3d 377 (2002). There also is a pending action in the Illinois Court of

negligent treatment of George which proximately caused his death on June 21, 1996. The complaint alleged that "in providing medical care to [George], it was the duty of Dr. C Lee, to possess and apply the knowledge and skill ordinarily possessed and applied by reasonably well-qualified physicians in the same or similar communities," and that Dr. Lee had breached that duty. As to Medlin, the complaint alleged "while providing services to [George], it was the duty of the Defendant, P. Medlin, to possess and apply the knowledge and skill ordinarily possessed and applied by reasonably well-qualified psych-3's in the same or similar circumstances," and that Medlin breached that duty. Both defendants admitted the allegations as to their respective duties, but denied that they breached those duties. The circuit court granted the defendants' motion for summary judgment on the grounds that the doctrine of sovereign immunity barred the action. Thus, subject matter jurisdiction properly lay in the court of claims rather than the circuit court.

A majority of the appellate court reversed the circuit court's grant of summary judgment to the defendants. 337 Ill. App. 3d 403. The majority stated that it believed that the duty owed to George by Dr. Lee and by Medlin arose independent of their state employment and that therefore Earlean could proceed against them in circuit court. 337 Ill. App. 3d at 416. This decision, according to the majority, was consistent with the reasoning in *Madden v. Kuehn*, 56 Ill. App. 3d 997 (1978), and *Watson v. St. Annes Hospital*, 68 Ill. App. 3d 1048 (1979), and their progeny. In those cases, the courts held that sovereign immunity did not bar a medical malpractice action against a state doctor where the source of the doctor's duty arose out of the physician-patient relationship rather than the doctor's status as a state employee. 337

---

Claims against the state regarding the decision not to involuntarily admit George to Madden Center.

Ill. App. 3d at 416. Justice Wolfson dissented, distinguishing *Madden* and *Watson,* and questioned the continued validity of those cases in light of this court's decision in *Healy v. Vaupel,* 133 Ill. 2d 295 (1990). 337 Ill. App. 3d at 419 (Wolfson, J., dissenting) (noting that in *Healy,* this court stated, " '[w]ithout commenting on the correctness of that decision, we decline to extend *Madden* to the present case' "), quoting *Healy,* 133 Ill. 2d at 313. Instead, Justice Wolfson found that because "the defendants never treated George," the reasoning of *Kilcoyne v. Paelmo,* 204 Ill. App. 3d 139 (1990), controlled. 337 Ill. App. 3d at 418-19 (Wolfson, J., dissenting). Justice Wolfson noted that in *Kilcoyne,* the court found that the decision to institutionalize a person was not an obligation that equated with those duties generally owed to patients by their doctors. 337 Ill. App. 3d at 419 (Wolfson, J., dissenting), quoting *Kilcoyne,* 204 Ill. App. 3d at 144-45. We granted the defendants' petition for leave to appeal. 177 Ill. 2d R. 315(a).

## ANALYSIS

Summary judgment is proper where the pleadings, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002); *Quad Cities Open, Inc. v. City of Silvis,* 208 Ill. 2d 498, 515 (2004). We review the grant of summary judgment *de novo. Quad Cities Open, Inc.,* 208 Ill. 2d at 515.

Article XIII, section 4, of the Illinois Constitution of 1970 provides, "Except as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4. Pursuant to that constitutional grant of authority, the legislature has acted to reinstate sovereign immunity. The State Lawsuit Immunity Act states, in relevant part, "[E]xcept as

provided in 'AN ACT to create the Court of Claims, \*\*\* the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2002). The Court of Claims Act establishes such a court to serve as a forum for actions against the state. 705 ILCS 505/1 *et seq.* (West 2002). Section 8 of the Court of Claims Act provides:

> "The court shall have exclusive jurisdiction to hear and determine the following matters:
>
> \* \* \*
>
> (d) All claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit, and \*\*\* provided, that an award for damages in a case sounding in tort, other than certain cases involving the operation of a State vehicle described in this paragraph, shall not exceed the sum of $100,000 to or for the benefit of any claimant." 705 ILCS 505/8(d) (West 2002).

The determination of whether an action is an action against the state depends on the issues raised and the relief sought. *Fritz v. Johnson*, 209 Ill. 2d 302, 310 (2004), quoting *Currie v. Lao*, 148 Ill. 2d 151, 158 (1992); *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990). As to the issues raised, we noted in *Healy v. Vaupel*, 133 Ill. 2d 295 (1990), that an action is against the state when there are:

> " '(1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State \*\*\*.' " *Healy*, 133 Ill. 2d at 309, quoting *Robb v. Sutton*, 147 Ill. App. 3d 710, 716 (1986).

Regarding the relief sought, a court must also consider whether the relief sought is such that "a judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Currie*, 148 Ill. 2d at 158.

The dispute here centers on the second factor noted

above, namely, whether the duty allegedly breached was not owed to the public generally independent of the fact of state employment. In *Currie v. Lao*, we created the "source-of-the-duty" test. *Currie*, 148 Ill. 2d at 159. We stated:

"A State employee is not immunized by sovereign immunity for his own acts of negligence merely because he was acting within the scope of his employment. [Citation.] *** [T]he proper inquiry is to analyze the source of the duty the employee is charged with breaching in committing the allegedly negligent act. Where the charged act of negligence arose out of the State employee's breach of a duty that is imposed on him *solely* by virtue of his State employment, sovereign immunity will bar maintenance of the action in circuit court. [Citations.] Conversely, where the employee is charged with breaching a duty imposed on him *independently* of his State employment, sovereign immunity will not attach and a negligence claim may be maintained against him in circuit court. ***

*** A State employee who breaches a duty he owes regardless of his State employment is no more entitled to immunity than is a private individual who breaches that same duty; the mere fact of his State employment should not endow him with heightened protection." (Emphases in original.) *Currie*, 148 Ill. 2d at 158-60.

In *Currie*, we applied the source-of-the-duty test to a plaintiff's action for negligence against a state trooper who had injured plaintiff in a motor vehicle accident. We examined the status of the state trooper in relation to his duty towards the plaintiff and also if the trooper was performing a uniquely governmental function. We found that the state trooper caused the accident while performing a "routine operation of a motor vehicle on a public street." The trooper, therefore, breached a duty towards the plaintiff that did not arise out of his employment. Instead, the duty arose as a result of his "status" as the driver of an automobile on a public roadway. *Currie*, 148 Ill. 2d at 161-63. Under the facts of that case, the state trooper was "not performing a uniquely governmental

function" at the time of the collision and the plaintiff's claim, therefore, was not against the state. *Currie,* 148 Ill. 2d at 162.

Our holding in *Currie* is consistent with the appellate court's analysis in both *Madden* and *Watson. Madden,* 56 Ill. App. 3d 997; *Watson,* 68 Ill. App. 3d 1048. In both *Madden* and *Watson,* the plaintiffs filed medical malpractice actions against doctors who allegedly negligently failed to properly diagnose and treat the ailments of the plaintiffs' decedents, which proximately caused their deaths. *Madden,* 56 Ill. App. 3d at 998-99; *Watson,* 68 Ill. App. 3d at 1050. In *Madden,* 56 Ill. App. 3d 997, the appellate court, in finding that sovereign immunity did not bar the action, stated that a doctor

"was not asserted to have been acting in an administrative or legislative capacity at the time of his examination and treatment of the decedent. Instead, the duties which he is alleged to have breached are those which every physician owes his patient, rather than obligations incurred solely by virtue of holding a public office." *Madden,* 56 Ill. App. 3d at 1001.

The court in *Watson* quoted this language from *Madden* and added,

"We hold in the instant cases, that plaintiffs' suits against the individual defendants seek recovery against their personal assets or such insurance as they may carry and, because the State is not amenable to liability and its actions are not subject to control for its alleged negligence, the State is not the real party in interest and the suits are not actions against the State which require that they be filed in the Court of Claims." *Watson,* 68 Ill. App. 3d at 1053.

Thus, both *Madden* and *Watson,* like our holding in *Currie,* focused on the source of the duty allegedly breached, rather than the mere fact of state employment.

We disagree with defendants and the appellate court's dissent that we found *Madden* and *Watson* to be inconsistent with the source-of-the-duty test in *Healy v. Vaupel,*

133 Ill. 2d 295 (1990). In *Healy*, a student gymnast at a state university brought a negligence action in the circuit court against various employees of the university, including a gymnastics coach and a gymnastics team trainer, after she was injured in a gymnastics accident. Although we mentioned in *Healy* that a law review article criticized the *Madden* case "as working an improper severance of the relationship between master and servant," we expressly refused to comment on the correctness of *Madden*. *Healy*, 133 Ill. 2d at 312-13, noting T. LeBlang, *Medical Negligence and the Court of Claims: A Dilemma for the Sovereign's Doctors*, 68 Ill. B.J. 534 (1980). Rather, we distinguished between the independent duty owed by a doctor to his patient based on the doctor-patient relationship and the derivative duty owed to the student by the gymnastics department employees because they worked for a state university. *Healy*, 133 Ill. 2d at 313. We stated:

> "Essential to the court's holding in *Madden* was the view that the duty of care owed by the physician arose independently of his status as an employee of the State; that conclusion may be said to rest on the special nature of the doctor-patient relationship. We do not believe that the same conclusion may be reached here." *Healy*, 133 Ill. 2d at 313.

Because we rely on the source-of-the-duty test, we reject defendants' argument that they would have had no duty towards George "but for" their employment with the state. Certainly, the present defendants would have not encountered George, and thus had no duty towards George, "but for" their employment at a state facility. However, the mere fact of employment at a state facility has never been dispositive in the consideration of whether an action is against the state. *Currie*, 148 Ill. 2d at 159. Rather, where the employee is charged with breaching a duty imposed on him independently of his state employment, sovereign immunity will not attach

and a negligence claim may be maintained against him in circuit court. *Currie*, 148 Ill. 2d at 159; see also *Fritz v. Johnston*, 209 Ill. 2d at 310-11 (applying the source-of-the-duty test to a claim for civil conspiracy based upon the commission of a crime and other acts committed in furtherance of that crime). We apply, therefore, the source-of-the-duty test to the facts of this case.

In the instant case, defendants argue that their duty arose solely out of their state employment, and that sovereign immunity bars adjudication of liability in circuit court of decisions regarding the involuntary admission of individuals to state mental health facilities. Plaintiff responds that under the source-of-the-duty test this action is not barred by sovereign immunity because the duty arose from defendants' status as mental health care professionals rather than from their state employment. Plaintiff also argues that defendants were not performing a uniquely governmental function.

Here, the source of the defendants' duty was their status as mental health professionals, rather than their employment by the state. Defendants used their professional expertise to determine whether George was a "[p]erson subject to involuntary admission," such that he was "[a] person with mental illness and who because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another person in the near future." 405 ILCS 5/1—119 (West 1996). Dr. Lee admitted that George was his patient during the intake procedure during his deposition. In his answer, he admitted that "in providing medical care to [George], it was the duty of Dr. C Lee, to possess and apply the knowledge and skill ordinarily possessed and applied by reasonably well-qualified physicians in the same or similar communities." Medlin is a licensed clinical professional counselor, and held the position of "psychologist three" at Madden Center and was responsible, in

her professional capacity, for helping Dr. Lee evaluate George. Medlin, in her answer, also admitted that "while providing services to [George], it was the duty of the Defendant, P. Medlin, to possess and apply the knowledge and skill ordinarily possessed and applied by reasonably well-qualified psych-3's in the same or similar circumstances." It was their duty to determine, according to their professional judgment, whether George had a mental illness and the level of risk that he presented to himself and others. Because Dr. Lee and Medlin were using their professional judgment in evaluating George, the source of their duty was their mental health professional status. They were not performing administratively by merely filling out forms, or "screening" George to determine if he was worthy of the expenditure of state resources. As stated by Dr. Lee in his deposition, the decision to admit a patient is "totally a clinical decision."

Dr. Lee additionally was not performing a uniquely governmental function. The record demonstrates the similarities in involuntary admission of patients into both private and public hospitals. Dr. Ali, the defendants' expert witness, has worked at both private and state hospitals, and testified that there was "absolutely" no difference in procedures, standards, or processes between the involuntary commitment of patients between a private hospital and a state hospital. The same standard of care would apply to both. Dr. Sachs also testified to this point. As Dr. Sachs explained his duty at Christ Hospital, "[m]y responsibility was to decide what the patient's disposition should be—is he safe to go home, or does he need an evaluation of possible admission—but not to decide where that should take place." The Mental Health Code further demonstrates the similarity between the admission of patients to private and state hospitals, as its provisions authorizing involuntary commitment to mental health facilities are applicable to both private and

state hospitals. 405 ILCS 5/3—600 through 3—611 (West 1996).

Furthermore, the duties inherent in the doctor-patient relationship emanate from the standards imposed by the profession itself. A physician's duty is to exercise the same degree of knowledge, skill, and care which a reasonably well qualified physician in the same or similar community would use under similar circumstances. *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986). This duty is derived from the doctor's status as a licensed physician and is not dependent upon the physician's employment status. We find here, therefore, that the source of the defendants' duty arose independently of their state employment.

We must additionally determine if the relief sought, a judgment in plaintiff's favor, would operate to control the actions of the state or subject it to liability. *Currie*, 148 Ill. 2d at 158. Defendants make an indirect argument which is closely related to the examination of the issues involved.[2] They assert that a judgment in favor of the plaintiff "could prompt the State to change its policies and require that the health care professionals involuntarily admit individuals to State facilities in virtually every instance, regardless of the actual need for admission, as a precautionary measure." This change in policy, the State argues, could spawn other lawsuits by patients for the deprivation of their freedom, and place an additional strain on state resources.

This speculative argument contains no basis in the

---

[2]We note that defendants do not make a direct argument on this point through an assertion that the actions of the state would be controlled by a money judgment because a judgment would be paid by the state under the State Employee Indemnification Act. 5 ILCS 350/2(d) (West 2002). The appellate court in *Janes v. Albergo*, 254 Ill. App. 3d 951, 965-66 (1993), and *Kiersch v. Ogena*, 230 Ill. App. 3d 57, 63-64 (1992), rejected this argument based on the distinction between liability and indemnification.

record. This argument also ignores the fact that plaintiffs do not complain here of the state's negligence. Moreover, state law already directs both state and private institutions to devote resources and fashion policy to adhere to the standard of care. 20 ILCS 1705/4.1 (West 1996) ("Services shall be provided in a safe, humane environment by staff with the appropriate credentials, licensure, and training. Services shall be based on professionally recognized models and shall be monitored for quality"). Plaintiff is merely alleging that the agents of the state, Dr. Lee and Medlin, failed to abide by their respective professional standards of care. If the circuit court enters a judgment in this action, the consequent state policy decisions and expenditure of future resources will remain dependent on the goal of meeting the standard of care already directed by existing state law. Therefore, a judgment in this action will not operate to control the actions of the state.

Lastly, we disagree with defendants and the dissenting justice below that *Kilcoyne v. Paelmo*, 204 Ill. App. 3d 139 (1990), guides our decision here. In *Kilcoyne*, on March 25, 1983, the plaintiff filed a "petition for involuntary admission" of the patient on the grounds that the patient had threatened to kill his father-in-law. *Kilcoyne*, 204 Ill. App. 3d at 141. The mental health professionals at the hospital evaluated the patient and found that he was "mentally ill and because of his illness [he was] reasonably expected to inflict serious physical harm upon himself or another in the near future." *Kilcoyne*, 204 Ill. App. 3d at 141. A judicial hearing was scheduled on the petition for involuntary admission, but, prior to the hearing, on March 28, 1983, the patient requested to be voluntarily admitted and a doctor certified the patient's request. The circuit court subsequently granted the voluntary admission request and dismissed the plaintiff's petition for involuntary admission.

The patient, however, on April 4, 1983, exercised his statutory right to be discharged under section 3—403 of the Code. *Kilcoyne*, 204 Ill. App. 3d at 141, citing Ill. Rev. Stat. 1987, ch. 91½, par. 3—403 (stating "[a] voluntary patient shall be allowed to be discharged from the facility at the earliest appropriate time, not to exceed 5 days *** unless within the 5 day period a petition and 2 certificates *** are filed with the court"). The patient informed the plaintiff of his discharge, and the plaintiff subsequently discussed the patient's discharge with a hospital "therapist." On April 7, 1983, the patient killed the father-in-law and held the patient's two stepchildren at knifepoint. *Kilcoyne*, 204 Ill. App. 3d at 142. The plaintiff's complaint alleged that defendants negligently released the patient after failing to properly diagnose and treat him.

The appellate court in *Kilcoyne*, in distinguishing *Madden* and *Watson*, noted that both those cases involved duties

> " 'which every physician owes his patient, rather than obligations incurred solely by virtue of holding a public office.' [Citation.] These duties involve those duties directly owed by the doctor to his patient, such as the duty to exercise reasonable care in the treatment and diagnosis of his patient.
>
> The services performed by the mental health care professionals here involved the determination of whether a person should be institutionalized by the State and the additional obligations incurred in making this determination." *Kilcoyne*, 204 Ill. App. 3d at 144-45.

The court found that the duties that arose arose solely by virtue of defendant's state employment.

We find *Kilcoyne* distinguishable. In *Kilcoyne*, there was no pending petition for involuntary admission at the time of the patient's release. It is also unclear if any person had been willing, at the time of the patient's release, to present a petition for involuntary commitment. The decision is silent as to whether a psychiatrist or other mental health care professional had a second op-

portunity to determine whether the patient was "certifiable" for involuntary commitment. Furthermore, the opinion does not mention if the record in that case contained any evidence that mental health professionals in private hospitals adhere to the same standards, processes, and procedures as mental health care professionals in state institutions with regards to the involuntary commitment of patients. Therefore, it is unclear whether the result of *Kilcoyne* was affected by a lack of any administrative machinery, namely, a petition for involuntary commitment, rather than the failure to diagnose and treat the patient as alleged in the complaint.

Here, the complaint is clearly directed to the alleged failure of Dr. Lee and Medlin to abide by their respective standards of care in their evaluation of George. Defendants' obligation was to perform a psychiatric examination using their professional skills to determine if George had a mental illness and presented an unreasonable risk of serious harm to himself under section 5—119 of the Code (405 ILCS 5/1—119 (West 1996)). Setting aside the question of whether George met the criteria under section 5—119 of the Code, it was the petition for involuntary admission that would have given Madden Center, in conjunction with the certificates of Dr. Sachs and Dr. Lee, the authority to detain George. 405 ILCS 5/3—601, 3—604 (West 1996). It was the role of Dr. Lee, with Medlin's assistance, to provide a second opinion to the diagnosis previously made by Dr. Sachs. 405 ILCS 5/3—610 (West 1996). If Dr. Lee had corroborated Dr. Sachs opinion, the petition would have been sufficient for the facility director of Madden Center to detain George pending the petition's adjudication in court. 405 ILCS 5/3—611 (West 1996). Furthermore, the materials before this court for purposes of the summary judgment motion, unlike in *Kilcoyne*, demonstrate that the standards are identical between state and private institutions. It is

clear here, as it was not in *Kilcoyne*, that plaintiff does not seek relief against defendants for failure to perform any administrative duties.

Nevertheless, it is possible to construe *Kilcoyne* as holding that the doctrine of sovereign immunity confines subject matter jurisdiction over actions concerning a physician's medical decision to involuntarily admit or not admit a patient into a state mental health facility to the Court of Claims. To the extent that *Kilcoyne* is read for this proposition, it is overruled due to the conflict with the source-of-the-duty analysis outlined above.

Accordingly, sovereign immunity does not bar plaintiff's complaint and subject matter jurisdiction lies in the circuit court.

CONCLUSION

For the reasons we have discussed, we affirm the judgment of the appellate court which reversed the trial court's grant of summary judgment on the basis of sovereign immunity.

*Appellate court judgment affirmed.*