LELAND PENROD *et al.*, Plaintiffs-Appellants, *v.* MERRILL LYNCH, PIERCE, FENNER & SMITH, INC *et al.*, Defendants-Appellees.

Third District   No. 78-43

Opinion filed January 26, 1979.

T. Donald Henson and Robert M. Hansen, both of Herbolsheimer, Lannon and Henson, P. C., of LaSalle, for appellant.

Halbert O. Crews, of Greenberg, Keele, Lunn & Aronberg, of Chicago, and Heroux and Noland, of Wheaton (Paul Noland, of counsel), for appellees.

Mr. PRESIDING JUSTICE BARRY delivered the opinion of the court:

The action underlying this appeal was instituted by Leland Penrod, his wife, Ruth, and their two children, Jeffrey and Stephen, by their father and next friend, Leland Penrod. The suit, filed against Merrill Lynch, Pierce, Fenner & Smith, Inc., hereinafter referred to as Merrill Lynch, and James Hume, their personal stockbroker and an account executive with Merrill Lynch, sought a determination of negligence and breach of fiduciary duty against the defendants. After a bench trial, judgment was entered for the defendants. The plaintiffs' post-trial motion was denied, and from this determination, the plaintiffs appealed.

At the trial, the testimony established that, since their marriage in 1955, Mr. & Mrs. Penrod had invested in stocks and bonds. While living in Pittsburgh in 1964, they purchased 100 shares of Marcor common stock through the brokerage house of Merrill Lynch.

Upon moving to Mendota, Illinois, in June of 1964, the Penrods purchased another 100 shares of Marcor stock through the defendant, James Hume, the Merrill Lynch account executive whom they were assigned and with whom they dealt exclusively through July or August of 1974. However, the Penrods held their own securities.

Over the years, additional purchases of Marcor common stock and Marcor convertible bonds were made by the Penrods and their two sons so that by August 1, 1974, the Penrods owned 730 shares of Marcor common stock and the equivalent of 567 additional shares of Marcor common stock through convertible bonds. While the Penrods had their account with Merrill Lynch, they bought mainly Marcor stock. From 1964 to 1974, the Penrods had 22 transactions with James Hume, including eight transactions from January of 1973 through July of 1974, seven of which involved Marcor. Approximately two-thirds of the Penrods' total assets, or 70 percent of their stock and bond holdings, were in Marcor as of August 1974.

James Hume appreciated that the Penrods had heavily invested in Marcor stock. Earlier in their dealings with Mr. Hume, Mrs. Penrod had told him of her husband's and her interest in Marcor. Mr. Hume sent the Penrods information on Marcor stock.

Since June 3, 1964, James A. Hume had in his possession a customer holding sheet which showed the Penrods' holdings. This sheet shows the Penrods' transactions in the market, their objectives and the type of securities they wished to own. It also shows the home phone number for the Penrods and Leland Penrod's business phone. By looking at this document, Mr. Hume could tell the nature of the Penrods' portfolio.

Prior to August 10, 1974, the Penrods learned of a possible tender offer from Mobil regarding Marcor stock. The newspapers indicated that the government was requesting a delay on the tender offer. As of August 1, 1974, the Penrods had plans for a vacation from August 10, 1974, to August 24, 1974, in an isolated area of Minnesota. On August 7, 1974, Mrs. Penrod telephoned James Hume and in a detailed conversation asked about the specifics of the tender offer and told him that she and her husband were interested in it. Mrs. Penrod was unaware of the specifics of the tender offer, never having been involved in one before. She called Mr. Hume for all the information she could get about it.

According to Mrs. Penrod, Mr. Hume agreed that government interference might delay the tender offer. He said the stockholders would have to approve the tender offer and that since Marcor stock was selling at around $26, this indicated that the tender offer was far in the future. Mr. Hume knew that the possible tender price was $35. Mrs. Penrod said that this was good and asked if it were safe for the Penrods to take their intended vacation. Mr. Hume said to go on vacation and have a good time, there being no reason to worry as the tender offer was far in the future. (No notes regarding this conversation were made by Hume on the Penrod's customer holding sheet, however.)

The Penrods left on vacation on August 10, 1974, and returned two weeks later. While on vacation, the Penrods saw nothing about the tender offer in the newspapers. On opening their mail after their return they discovered that the tender offer was at an end, having lasted from August 12 to August 23, 1974. The next business day following the expiration of the tender offer Marcor closed at $18.75. Subsequently, the Penrods sold their convertible bonds. When Marcor and Mobil merged the Penrods received Mobil stocks and bonds for their Marcor shares.

While the Penrods had been dealing with Merrill Lynch, the brokerage firm offered a service whereby a customer's securities would be held by Merrill Lynch, to be handled upon directions from the customer. During their phone conversation, Mr. Hume did not tell Mrs. Penrod that he could hold her securities for her. Mr. Hume admitted that

if Merrill Lynch had held the Penrods' stock, Mr. Penrod could have tendered his shares by a call from Mr. Hume. Merrill Lynch also offered a service at this time by which a customer could give Mr. Hume his shares of stock to be sold when the stock reached a given price. By this frequently utilized vehicle, a customer places an order on a "good until cancelled" basis, and Merrill Lynch does not even require a confirmation when the event occurs. James Hume also did not discuss this service with the Penrods.

At the time of the tender offer, James Hume had about six more customers who held their own shares of Marcor. He did not call any of these customers.

Although he knew that the Penrods had invested heavily in Marcor, James Hume did nothing with regard to the Penrod account. He was aware of the short period of the tender offer, but he did not peruse his customer holding sheets to see which of his customers held Marcor stock. The phone numbers on the customer holding sheet were there so that Mr. Hume could contact the Penrods if he felt it necessary, but he did not do so.

Mr. Hume stated that at the time of the tender offer he did not recollect the prior phone conversation with Mrs. Penrod. He said that he recalled none of his customers who held their own Marcor stock calling about Marcor stock within the week before the tender offer except the Penrods. He admitted that on other occasions he would possibly have called a customer or two whose stock he was not holding. This would occur when a very specific discussion had taken place within a day or so and was very fresh in his mind.

Although Mr. Hume testified that this tender offer was not an item of great interest in the stock market compared with all the events of the day, he could recall no other events at that time, nor how many tender offers there had been that day. He further admitted that the fact that this tender offer had finally come to fruition was of some substance, and that the fact that Marcor was selling for $26 on the day he spoke with Mrs. Penrod and three business days later when this tender offer occurred the price was $35 indicated that this was something of rather substantial importance.

James Hume stated that when he bought or sold shares for the Penrods, he would get a commission. However, if the Penrods had taken advantage of this tender offer, he would not have received a commission.

Regarding the phone conversation he had with Mrs. Penrod, Mr. Hume testified that there was no discussion about when the tender would occur. He did not recall Mrs. Penrod inquiring about the immediacy of the tender offer, nor telling her that the tender offer price indicated that the tender offer was not near. He did recall telling her that the newspapers spoke of a tender offer price of $35. Mr. Hume told Mrs. Penrod that a

great many contingencies could take place on this tender offer and went on to have a short conversation on tender offers. There was talk of a governmental investigation. Mr. Hume did not recall if Mrs. Penrod said that she and her husband had never been involved in a tender offer. He recalled Mrs. Penrod remarking about an upcoming vacation, but did not recall telling her not to worry and to go ahead and have a good time.

Donald Fell, called as an expert witness by the plaintiffs, testified that he was the chairman of the department of business at Illinois Valley Community College. He taught economics, labor economics, business administration, finance, investments, and insurance. He taught for approximately eight years and had a bachelor's and master of arts degree in economics and business administration, nearly having completed his doctorate. Mr. Fell had courses in finance, business law and investments at undergraduate and graduate levels, which courses involved selling and purchasing of stocks and bonds and offers to purchase stock. He taught courses dealing with investments, purchasing, mergers and tender offers, monitored classes in which stockbrokers were teaching stocks and bond courses and personally purchased and sold securities. Mr. Fell stated that he subscribed to Business Week, Forbes and Fortune magazines, received newsletters from Chicago and New York banks and had a fairly good reference library, all dealing with stock transactions.

Further, Mr. Fell was familiar with tender offers and explained their operation. However, when he was asked a hypothetical question based on the facts of this case as to the exercise of due care by a broker in such a situation, the court ruled that Mr. Fell could not express an opinion as he was not an expert. The court ruled that Mr. Fell was established as an expert in finance, but not as an expert regarding the activities of a stockbroker. Under an offer of proof, Donald Fell stated an opinion that the hypothetical stockbroker did not act with reasonable care.

■▌ One of the issues raised by the plaintiffs is whether the trial court erred in ruling that the witness, Mr. Fell, was not an expert regarding stockbroker activities. Whether any particular witness is competent to render an expert opinion is a question of fact for the trial judge and is subject to review only upon a clear showing of an abuse of discretion. (*Schwartz v. Alton & Southern Ry. Co.* (5th Dist. 1976), 38 Ill. App. 3d 528, 347 N.E.2d 829.) "Testimony will not be accepted as expert unless the witness exhibits a peculiar knowledge or expertise beyond that of the average layman or juror. * * *. He had no first hand knowledge * * *." (*Hagerman v. National Food Stores, Inc.* (2d Dist. 1972), 5 Ill. App. 3d 439, 442, 283 N.E.2d 321, 323.) In this case, the trial court found that the witness had some expertise as to financial matters generally, but none as to the activity of stockbrokers specifically. The witness is a college teacher of economics, finance, business administration, investment and

insurance. While the trial judge could find the witness was aware of the theories of investment and the stock market, the witness had not established that he has any experience as a member or exployee of a brokerage firm nor that he has any knowledge of the workings of such an office. We find no abuse of discretion.

■■■ The other issue raised by the plaintiffs is whether the defendants owed a duty of some kind to the plaintiffs. In discussing the existence of a duty, we must note that we are dealing with two different areas of the law. Whether an agency relationship existed between the plaintiffs and the defendants is a question of fact, and the appellate court will not disturb the findings of the trial court unless those findings are against the manifest weight of the evidence. (*Krug v. Machen* (2d Dist. 1974), 24 Ill. App. 3d 526, 321 N.E.2d 85.) Unless the defendants can somehow be determined to be the agents of the plaintiffs, no fiduciary duty can exist. The agency relationship is a fiduciary relationship, the agent sustaining a position of trust toward the principal, so that the agent must act in the utmost good faith, making known to his principal all material facts within the agent's knowledge which in any way affect the transaction or subject matter of the agency. (See *Moehling v. W. E. O'Neil Construction Co.* (1960), 20 Ill. 2d 255, 170 N.E.2d 100; *Lerk v. McCabe* (1932), 349 Ill. 348, 182 N.E. 388.) However, a broker, though an agent, is not a general agent of the principal, but acts on behalf of the principle for a single objective. (*City of Chicago v. Barnett* (1949), 404 Ill. 136, 88 N.E.2d 477.)

> "A broker is distinguished from an agent in that a broker sustains no fixed and permanent employment by, or relation to, any principal, but holds himself out for employment by the public generally, his employment in each instance being that of special agent for a single object, [citation] whereas an agent sustains a fixed and permanent relation to the principal he represents and owes a permanent and continued allegiance." (*City of Chicago v. Barnett* (1949), 404 Ill. 136, 142, 88 N.E.2d 477, 481.)

Once a broker-principal relationship is established, a broker, who by mistake or act of omission or commission fails to perform pursuant to the specific agency purpose, is liable to the principal for any damage sustained thereby. (*Johnston v. Otta* (2d Dist. 1950), 340 Ill. App. 270, 91 N.E.2d 468.) Furthermore, the fiduciary nature of the relationship continues to exist even though the broker is a mere volunteer at a nominal consideration, and the principal is entitled to the exercise of all the skill, ability and industry of the broker. (*Lerk v. McCabe* (1932), 349 Ill. 348, 182 N.E. 388; *Sams v. Rigg* (3d Dist. 1949), 339 Ill. App. 25, 88 N.E.2d 673.) On the other hand, once the limited purpose is accomplished, that is, the limited purpose for which the broker's agency is established, the broker no longer owes any on-going fiduciary duty to the ex-principal.

See *Pittway Corp. v. American Motorists Insurance Co.* (2d Dist. 1977), 56 Ill. App. 3d 338, 370 N.E.2d 1271.

■ Since the plaintiff's prior transactions through the defendants were all completed and the plaintiff held their own stock, the fact question presented to the trial court, simply stated, was whether the telephone conversation between Mrs. Penrod and Mr. Hume created a new principal-broker relationship. Mrs. Penrod asked specific questions which appear to have been answered to the best of the ability of Mr. Hume. Although Mrs. Penrod was concerned about the tender offer, the record does not establish that she expressed a desire on the part of the Penrods to tender the Marcor stock when the offer was open or expressed a desire to have Mr. Hume act as their agent in any respect. The trial court could find from the facts presented at trial that Mrs. Penrod, in making the telephone call, was only interested in obtaining information. The mere seeking of information does not create a principal-broker relationship, and the trial court properly so found. The defendants owed no fiduciary duty to the plaintiffs, and therefore no duty to attempt to locate the plaintiffs in Minnesota to inform them of the tender offer.

■ As to the negligence aspect of this case, the existence of a duty in a negligence case is a question of law. (*Laflin v. Estate of Mills* (1st Dist. 1977), 53 Ill. App. 3d 29, 368 N.E.2d 522.) Where one negligently gives incorrect information, liability arises only if there was a duty to give correct information if one speaks at all. (*Renn v. Provident Trust Co.* (1938), 328 Pa. 481, 196 A. 8.) If it is one's business to supply information and if that information is negligently supplied, especially where the person supplying the information knows that some action will be influenced by the information, the supplier of the information can be held liable for the resultant damages. (*Renn v. Provident Trust Co.* (1938), 328 Pa. 481, 196 A. 8.) The Restatement of Torts §552 (1938) states the same rule thusly:

> "One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if
>
> (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and
>
> (b) the harm is suffered
>
>> (i) by the person or one of the class of persons for whose guidance the information was supplied, and
>>
>> (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

This rule, in the form of section 552 of the Restatement of Torts, has been embraced by the Illinois courts. (*Citizens Savings & Loan Association v. Fischer* (5th Dist. 1966), 67 Ill. App. 2d 315, 214 N.E.2d 612; *Guaranty Bank & Trust Co. v. Reyna* (1st Dist. 1964), 51 Ill. App. 2d 412, 201 N.E.2d 144.) And of course, a corporation or other principal may be held liable for its employee's or agent's negligent misrepresentation. (*Citizens Savings & Loan Association v. Fischer* (5th Dist. 1966), 67 Ill. App. 2d 315, 214 N.E.2d 612.) Certainly, it is no less serious for a person supplying the information to negligently omit to supply material information which would affect a business decision of the person receiving the information.

Whether a particular defendant has exercised the requisite care for the situation presented, however, is a question of fact. (*Sheley v. Guy* (4th Dist. 1975), 29 Ill. App. 3d 361, 330 N.E.2d 567, *aff'd* (1976), 63 Ill. 2d 544, 348 N.E.2d 835.) In testifying, Mrs. Penrod stated that, during the telephone conversation with Mr. Hume, Mr. Hume agreed that government interference might delay the tender offer and added that the stockholders would have to approve the tender offer. In addition, according to Mrs. Penrod's version of the conversation, Mr. Hume stated that since Marcor stock was selling at $26 and the tender price was $35, the tender offer was probably far in the future so the Penrods could go on vacation, have a good time and not worry about the tender offer. Mr. Hume, on the other hand, tells a slightly different story about the conversation. Mr. Hume testified that during the telephone conversation, there was no discussion concerning when the tender offer would occur. Although he recalled being informed of the Penrods' upcoming vacation, he did not recall telling her to go ahead and have a good time, nor does he recall Mrs. Penrod inquiring about the immediacy of the tender offer. While he did tell her that the newspapers spoke of a tender price of $35, that a great many contingencies could take place, and that there was talk of a government investigation, he never indicated that the tender offer was not near. Instead, there was a short conversation about tender offers, according to Mr. Hume.

It is the function of the trier of fact, having the advantage of observing witnesses as they testify, to assess credibility and assign weight to the evidence. The trial court certainly could have believed Mr. Hume's version of the telephone conversation and not Mrs. Penrod's. Even accepting Mrs. Penrod's version, there was no indication to Mr. Hume that the Penrods definitely wanted to tender their stocks. Furthermore, Mr. Hume testified that he did not get the impression from the conversation that Mrs. Penrod was concerned about the immediacy of the tender offer. Certainly, had Mrs. Penrod stated that the Penrod family definitely wanted to tender their stocks but were leaving on vacation and asked, straight out, how they could accomplish tendering the stocks if the

tender offer occurred while they were on vacation, we would have a different case, especially as to the failure of Mr. Hume to inform Mrs. Penrod of the availability of the services whereby Mr. Hume could tender the stocks for the Penrods and possibly as to the failure to attempt to reach the Penrods in Minnesota when the tender offer occurred. However, such is not the case.

Accordingly, the judgment of the Circuit Court of La Salle County is affirmed.

Judgment affirmed.

ALLOY and SCOTT, JJ., concur.