FIRST MIDWEST BANK, N.A., ) Appeal from the 

) Circuit Court of 

Plaintiff-Appellant, ) Cook County.

)

v. )

)

STEWART TITLE GUARANTY COMPANY, a ) Nos. 98 CH 7065 &

Texas Corporation, ) 99 CH 7228

)

Defendant-Appellee, ) 

)

CLEAR TITLE, INC., an Illinois )

Corporation, INTERCOUNTY NATIONAL )

TITLE INSURANCE COMPANY, an )

Illinois Corporation, ) Honorable

) John K. Madden,

Defendants. ) Judge Presiding.

PRESIDING JUSTICE REID delivered the opinion of the court:

The plaintiff, First Midwest Bank, N.A. (First Midwest), appeals from the trial court’s orders regarding its second amended complaint that granted Stewart Title Guaranty Company’s (Stewart Title): (1) motion for summary judgment with regard to count I, which sought a declaration that Stewart Title is liable to First Midwest with regard to a title insurance policy it issued, and (2) motion under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1998)), motion to dismiss count II, which alleged negligent misrepresentation.
(footnote: 1)
 First Midwest argues that the trial court’s decisions were erroneous because: (1) its decision to refinance the initial acquisition loan did not terminate Stewart Title’s liability under the title insurance policy it issued, and (2) it stated a cause of action for negligent misrepresentation where Stewart Title was in the business of selling information and issued a title commitment that failed to show that the property in question contained a restrictive covenant that prohibited business and commercial use.  For the reasons that follow, we affirm.

BACKGROUND

In July 1995, John Bergeron and Glenda Bergeron (the Bergerons) entered into a contract to purchase property commonly known as 950 North St. Mary’s Road, in Green Oaks, Lake County, Illinois (the premises).  Subsequently, the Bergerons applied to First Midwest to provide financing for the initial purchase of the premises.  On several occasions during the loan process, the Bergerons expressed to Dave Williams, the senior vice-president at First Midwest, their intention to use the premises for residential purposes and also as a home office for their business, Downeast Design Group, Inc. (DDG), an architectural and interior design firm.

On August 24, 1995, Stewart Title issued a commitment for title insurance to the Bergerons and First Midwest as proposed insureds with respect to the premises in the amount of $300,000.

On August 31, 1995, First Midwest’s loan committee met and approved the initial $300,000 acquisition loan to the Bergerons, to be guaranteed by DDG for the premises to be used as a home/office subject to the Bergerons receiving a title insurance policy free of any restrictions.

In consideration of the loan that they received, on October 5, 1995, the Bergerons executed a $300,000 promissory note to First Midwest.  The Bergerons also executed a mortgage on the premises in the amount of $300,000 with First Midwest Mortgage Corp.  On October 18, 1995, Stewart Title issued a lender’s insurance policy to First Midwest in the amount of $300,000 insuring the mortgage lien.

On July 3, 1996, First Midwest lent an additional $300,000 to the Bergerons for the purpose of building separate office space on the premises.  First Midwest refers to this loan as the construction loan.  In connection with the construction loan, defendants, Intercounty National Title Insurance Co. (Intercounty) and Clear Title, Inc. (Clear Title), which was acting as an agent for Intercounty, issued a title commitment, as well as a policy of title insurance to First Midwest in the amount of $300,000, with an effective date of June 19, 1996.  Williams testified that First Midwest obtained the Intercounty policy of title insurance in connection with the construction loan because the initial $300,000 policy issued by Stewart Title for purposes of the Bergerons’ acquisition of the premises was not enough to cover the additional $300,000 of exposure First Midwest created by the construction loan.

In May 1997, First Midwest approved a $752,000 loan to the Bergerons and DDG.  First Midwest categorized this loan as a wraparound loan.  First Midwest alleged that this loan wrapped together the two prior loans of $300,000 along with prior loans issued to the Bergerons and DDG.  In connection with the wraparound loan, Intercounty and Clear Title issued a title commitment, as well as a policy of title insurance to First Midwest in the amount of $752,000.  Williams testified that First Midwest obtained the $752,000 policy of title insurance from Intercounty in connection with the wraparound loan because the $300,000 Stewart Title policy and the $300,000 policy issued by Intercounty in connection with the construction loan was not enough to cover the additional exposure to First Midwest created by the wraparound loan.  The $300,000 mortgage insured by the Stewart Title policy was serviced by First Midwest Mortgage Corp., an entity related to First Midwest.

In connection with the funding of the $752,000 wraparound loan, First Midwest Mortgage Corp. prepared and sent to the Bergerons a payoff statement dated June 10, 1997.  According to the statement, the payoff figure on loan number 00710004444 through June 15, 1997, was $296,853.28.  This is the same loan number that appears on the mortgage and the promissory note.

It was Williams’ testimony that it was his understanding that the wraparound loan paid off the $300,000 purchase loan and the $300,000 construction loan.  A check dated June 13, 1997, shows that First Midwest paid First Midwest Mortgage Corp. $296,853.28. 

In a letter dated July 2, 1997, First Midwest Mortgage Corp. issued a release of the mortgage with regard to the premises as being paid.  On July 7, 1997, Shari Thompson of First Midwest Mortgage Corp. wrote a letter to First Midwest, wherein she included a copy of the aforementioned release regarding the premises.  In a letter dated July 8, 1997, Thompson informed the Bergerons that the initial $300,000 loan had been paid in full.  Furthermore, in another letter dated July 8, 1997, Thompson wrote to the Bergerons informing them that with regard to loan 00710004444, “Our records indicate that your account is paid in full.  Therefore, we are refunding your escrow account to you.  Enclosed you will find a check in the amount of $2,183.46.”  In connection with the wraparound loan, the Bergerons executed a disbursement request and authorization, which instructed First Midwest to pay $295,930.22 of principal and $923.06 of interest, which totaled $296,853.28 on loan 00710004444.

On May 13, 1999, First Midwest initiated this action.  On September 9, 1999, First Midwest filed a three-count second  amended complaint for declaratory judgment and damages.  First Midwest alleged that in October 1997 it learned that a restrictive covenant had been recorded against the premises which provided that no part of the premises could be used for business or commercial purposes.  First Midwest asserted that it would not have made any of the loans to the Bergerons had it known of the restrictive covenant beforehand.

Count I sought a declaration that Stewart Title is liable to First Midwest on the title insurance policy it issued.  First Midwest alleged that Stewart Title and Clear Title, acting as an agent of Stewart Title, issued an initial title insurance commitment and ultimately a policy of title insurance which failed to accurately reflect that a restrictive covenant of record encumbered title to the premises.  Count I also sought a declaration that Intercounty is liable to First Midwest on the title policies that Intercounty issued to First Midwest in connection with the $300,000 construction loan and the $752,000 wraparound loan.  Finally, count I sought a declaration that Clear Title is liable on all three title policies on the grounds that Clear Title was acting as the agent for Stewart Title and Intercounty in issuing the respective title policies.

Count II attempted to state a cause of action for negligent misrepresentation against Stewart Title, Clear Title and Intercounty on the grounds that each defendant negligently sold information when the Stewart Title and Intercounty title commitments were issued.

Count III attempted to state a cause of action for fraudulent misrepresentation against Stewart Title, Clear Title and Intercounty on the grounds that each of the defendants fraudulently sold inaccurate information when the Stewart Title and Intercounty commitments were issued.

Both Clear Title and Intercounty filed for bankruptcy protection after the commencement of this matter.  Consequently, neither is a party to this appeal.

As to count I, Stewart Title filed a motion to dismiss pursuant to section 2-619 of the Illinois Code of Civil Procedure (Code).  (735 ILCS 5/2-619 (West 1998)).  As to counts II and III, Stewart Title filed a motion to dismiss pursuant to section 2-615.  735 ILCS 5/2-615 (West 1998).  On January 28, 2000, the trial court denied both of Stewart Title’s motions.  In its order, the trial court stated that, with regard to count II and III, Stewart’s motion to dismiss was a section 2-619 motion to dismiss.  On February 17, 2000, Stewart Title filed a motion to reconsider the trial court’s January 28, 2000 order.

On March 3, 2000, the trial court denied Stewart Title’s motion to dismiss count I pursuant to section 2-619, and granted with prejudice Stewart Title’s motion to dismiss counts II and III pursuant to section 2-615.  First Midwest moved the trial court to reconsider its March 3, 2000 order which dismissed counts II and III.  First Midwest’s motion to reconsider was denied on September 22, 2000.  

On January 23, 2003, Stewart Title filed a motion for summary judgment with regard to count I of First Midwest’s second amended complaint.  The trial court granted Stewart Title’s motion for summary judgment on June 13, 2003.

First Midwest filed a motion for the trial court to reconsider its order that granted Stewart Title summary judgment.  On September 22, 2003, the trial court issued an order that stated:

“It is hereby ordered that the Plaintiff’s motion to reconsider is denied;

It is further ordered that there is no just reason to delay enforcement or appeal of the order dated June 13, 2003 granting summary judgment to Stewart Title as to count I and the order dated March 3, 2000 granting Stewart Title’s motion to dismiss counts II and III and the denial of Plaintiff’s motion to reconsider dated September 22, 2000.”

First Midwest filed it notice of appeal on October 21, 2003. 

ANALYSIS

I

We will first examine whether the trial court erred when it granted summary judgment with regard to count I of First Midwest’s second amended complaint.

Summary judgment is appropriately granted where the pleadings, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 2002); 
Jinkins v. Lee
,
 209 Ill. 2d 320, 329 (2004).  We review 
de
 
novo
 the trial court's grant of summary judgment. 
Jinkins
,
 209 Ill. 2d at 329. 

The relevant portions of the title insurance policy that Stewart Title issued follow:

“9. 
REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

*  *  *

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto.  The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.”

Section 2 states:

“2. 
CONTINUATION OF INSURANCE

(a) 
After acquisition of Title.
  The coverage of this policy shall continue in force as of Date of Policy in favor of (I) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee’s sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquire [(
sic
) missing word or words due to hole puncture in original document] an insured corporation, provided the transferee is the parent or wholly owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) 
After Conveyance of Title.
  The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest.  This policy shall not continue in force in favor of any purchaser from the insured of either (I) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) 
Amount of Insurance
.  The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(I)  the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amount expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii)  the amount paid by any governmental agency or governmental instrumentality if the agency or instrumentality, is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.”

First Midwest argues that the trial court erroneously granted Stewart Title’s motion for summary judgment with regard to count I.  First Midwest contends that Stewart Title’s motion for summary judgment was based on the proposition that when the wraparound loan of $752,000 was issued, which consolidated the two previous $300,000 loans, it terminated Stewart Title’s liability under the policy of title insurance it issued.

First Midwest maintains that Stewart Title and the trial court erroneously relied on language found in section 9(c) of the title insurance policy which states that “the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.”

First Midwest argues that a refinancing does not terminate Stewart Title’s liability under the title insurance policy.  Rather, First Midwest asserts that the “policy states that the coverage ‘shall continue in force in favor of an insured so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage.’”

First Midwest complains that Stewart Title ignores the language upon which it relies, which would be rendered of no force and effect if Stewart Title’s interpretation of the policy is followed.  First Midwest asserts that refinancing and consolidation of loans are common in the lending and real estate communities.  First Midwest contends that when one loan is consolidated into a superseding loan of a larger amount, the original smaller loan must be canceled in some manner.  It is First Midwest’s position that the fact that one such loan is “paid” by the issuance of another loan of a larger amount is not a liquidation of the debt.

First Midwest complains that the initial indebtedness of $300,000 has not been satisfied.  First Midwest argues that it was merely consolidated into the wraparound loan.  First Midwest maintains that the original transaction for which Stewart Midwest wrote insurance has not been extinguished, but merely included with other amounts.

First Midwest points out that the lender, the borrower and the real estate involved in this transaction all remain the same.  First Midwest maintains that just because the purchasers may have increased their obligation, this court should not let Stewart Title off the hook.

First Midwest contends that it intended to purchase insurance against loss or damage by reason of, among other things, a defect in title.  First Midwest argues that the policy of insurance is not to protect the mortgage document but to protect the amount of the loan, which is merely evidenced by the note and mortgage.  In this matter, First Midwest maintains that the original note and mortgage were evidence of the indebtedness of $300,000.  It is First Midwest’s position that the original indebtedness was never extinguished, but was merely refinanced as part of a larger loan.

We disagree.  We find that the trial court’s decision to grant Stewart Title’s motion for summary judgment as to count I was correct.  In situations as this one, where the mortgage loan that was insured by the title policy is paid or voluntarily satisfied, the insurer’s liability under the title policy is terminated.

The resolution of this issue turns on the proper application of the aforementioned paragraph 9(c) of the title insurance policy.  According to this paragraph, any and all liability Stewart Title had under the title insurance policy was extinguished when the insured mortgage was paid in full by any person, voluntarily satisfied, or released, except as provided in section 2(a).

Here, the record shows that the indebtedness which was secured by the mortgage was paid within the meaning of paragraph 9(c) of the title insurance policy.  First Midwest funded the wraparound loan, which, 
inter
 
alia
, satisfied the insured mortgage.  This is evidenced by a check dated June 13, 1997, which shows that the wraparound loan paid off the $300,000 purchase loan in addition to the $300,000 construction loan.  Furthermore, letters that Shari Thompson of First Midwest sent to the Bergerons showed that the initial $300,000 loan had been paid in full and that the insured mortgage was released, on July 2, 1997.  This constituted an independent and sufficient occurrence causing termination of Stewart Title’s liability under the policy pursuant to paragraph 9(c).  

First Midwest’s only recourse is to turn to paragraph 2(a) of the policy, which is an exemption to paragraph 9(c).  Instead, First Midwest ignores paragraph 2(a).  Rather than use paragraph 2(a), First Midwest misquotes portions of paragraph 2(b) of the policy to argue that it still enjoys coverage, when it contends that the “policy states that the coverage ‘shall continue in force in favor of an insured so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage.’”  

Stewart Title points out and this court notes that paragraph 2(b) actually states the following:

“(b) 
After Conveyance of Title.
  The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest.”

The language that First Midwest chose to ignore was vital to a complete understanding of paragraph 2(b).  Paragraph 2(b) protects the interest of an insured mortgage in the event that the mortgagee conveys title to a third person while the insurance is in force and the mortgagee retains an interest in the land.  That is not the situation here.  First Midwest did not convey its interest in the mortgage and retain an insured interest in the premises.  As was stated above, this is evidenced by the fact that the mortgage was paid and subsequently released.  First Midwest has no interest in the mortgage described in the policy which Stewart Title issued.  

Ultimately, however, this is of no importance, because only  paragraph 2(a) provides an exemption to paragraph 9(c).  The exception found in paragraph 9(c) refers to paragraph 2(a) and not to paragraph 2(b).  Once payment in full occurred, or the satisfaction or release of the insured mortgage occurred, both of which happened in this matter, all liability of the title company terminated.  Nothing in paragraph 2(b) operates to revive any such liability.  Furthermore, nothing in paragraph 2(a), the proper exemption, provides relief for First Midwest in this situation.

First Midwest’s assertion that the policy protects the amount of the loan and not the mortgage is incorrect.  The policy itself states that it is the priority and the validity of the mortgage lien, not the indebtedness, that is insured.  One need only look at the front of the policy to ascertain this fact.  The policy continuously refers to the “insured mortgage.”  Nowhere does the policy state that it insures the amount of First Midwest’s loan.  If this were the case, Stewart Title would cover a default by the Bergerons, regardless of the validity or priority of the mortgage lien.

Additionally, we note the fact that in connection with the $300,000 construction loan and the $752,000 wraparound loan, First Midwest obtained title insurance policies from Intercounty and Clear Title and recorded new mortgages against the premises in the amounts of  $300,000 and $752,000.  Here, there is no question that First Midwest should have brought suit against Intercounty and Clear Title (except for their current bankrupt status).

Lastly, First Midwest contends that the policy should be strictly construed against Stewart Title because it is ambiguous.  First Midwest argues that the terms of the policy are ambiguous and “indeed contradictory.”  For instance, First Midwest argues that the policy fails to adequately define the terms “indebtedness” and “release.”

First Midwest argues that paragraph 9(c), which Stewart Title relies upon, and paragraph 2(c), which it relies on, conflict.  It is First Midwest’s contention that “Stewart relies solely on the wording of Section 9(c), which states that payment in full or the voluntary satisfaction or release of the insured mortgage terminates all liability, except as provided in [s]ection 2(a).  The bank relies on the provisions of [s]ection 2(c) which state[] that coverage continues in favor of an insured only so long as the insured retains an estate or interest in the land.  Each of these terms, by itself, support[s] the arguments of the respective parties.”  As such, First Midwest contends that the policy is ambiguous.

The construction of insurance policies is a question of law that this court determines 
de
 
novo
.
  
Jones v. State Farm Mutual Automobile Insurance Co.
, 289 Ill. App. 3d 903, 913 (1997).  “The function of the court in construing an insurance policy is to ascertain and enforce the intention of the parties as expressed in the agreement, and the construction given the policy should be a natural and reasonable one. 
 
de los Reyes v. Travelers Insurance Co.
,
 135 Ill. 2d 353, 358, 553 N.E.2d 301, 304 (1990).  If the language of an insurance policy is ambiguous, it must be construed against the insurance company and in favor of the insured.  
Allstate Insurance Co. v. Gonzalez-Loya
,
 226 Ill. App. 3d 446 (1992). However, if a policy of insurance is clear and unambiguous, it must be enforced according to its terms.  
United States Fire Insurance Co. v. Schnackenberg
,
 88 Ill. 2d 1, 429 N.E.2d 1203 (1981).  ***  This court cannot strain or torture the language of an insurance policy to create an ambiguity.  
Gonzalez-Loya
,
 226 Ill. App. 3d at 449.”  
Jones v. State Farm Mutual Automobile Insurance Co.
, 289 Ill. App. 3d 903, 910 (1997).
 First Midwest’s argument is not valid.  The policy is not ambiguous or contradictory.  First Midwest’s argument that the terms “indebtedness” and “release” as used throughout the policy are ambiguous lacks merit.  Furthermore, First Midwest’s argument that the policy is circular in nature and confusing also lacks merit.  A reading of the policy and of the paragraphs at issue

clearly shows that there are no ambiguities or contradictions within the policy.  As such, summary judgment was appropriate.

II

Next, we will examine whether the trial court erred when it dismissed count II for a failure to state a cause of action for negligent misrepresentation.

“A motion to dismiss under section 2-615 of the Code challenges the sufficiency of the complaint.  
[Citation.]  The trial court must determine whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a claim [for] which relief may be granted. 
 
[Citation.]  In making this determination, the trial court must accept as true all well-pleaded facts in the complaint.”  
Muirfield Village Vernon Hills, LLC v. K. Reinke, Jr. & Co.
,
 349 Ill. App. 3d 178, 187-88 (2004).  We review 
de
 
novo
 the trial court's determination.  
Muirfield Village
,
 349 Ill. App. 3d at 188.

“In [
Moorman Manufacturing Co. v. National Tank Co.
, 91 Ill. 2d 69 (1982),]  the supreme court adopted the economic loss doctrine, indicating that when a defect in a product is qualitative in nature and relates to a consumer's expectation that the product is of a particular quality, resulting in economic loss but no personal injury or property damage, the consumer's remedy lies in contract, not in tort.  
Moorman
,
 91 Ill. 2d at 88.  The 
Moorman
 doctrine bars tort recovery for purely economic losses even when the plaintiff has no contract remedy.  
Anderson Electric, Inc. v. Ledbetter Erection Corp.
,
 115 Ill. 2d 146, 153, 503 N.E.2d 246 (1986).  The 
Moorman
, doctrine applies to products and services.  See, 
e.g.
, 
Tolan & Son
,
 308 Ill. App. 3d 18, 719 N.E.2d 288 (applying 
Moorman
 doctrine to services of architect and engineer).
 Economic loss is recoverable, however, ‘where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations.’ 
Moorman
,
 91 Ill. 2d at 88-89.  A negligent misrepresentation consists of: (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information. See M. Polelle & B. Ottley, Illinois Tort Law § 14.02[5][b] (2001); 
Neptuno Treuhand-Und Verwaltungsgessellschaft Mbh v. Arbor
,
 295 Ill. App. 3d 567, 572-74, 692 N.E.2d 812 (1998).  This exception does not apply when the information ‘supplied is merely ancillary to the sale [of a product or service] or in connection with the sale.’  
Fireman's Fund Insurance Co. v. SEC Donohue, Inc.
,
 176 Ill. 2d 160, 168, 679 N.E.2d 1197 (1997).
 The negligent misrepresentation exception has been applied to pure information providers such as accountants (
Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.
,
 159 Ill. 2d 137, 636 N.E.2d 503 (1994)); a bank providing credit information to a potential lender (
DuQuoin State Bank v. Norris City State Bank
,
 230 Ill. App. 3d 177, 595 N.E.2d 678 (1992)); aircraft, inventory and termite inspectors (
Haimberg v. R&M Aviation
,
 Nos. 99-3554, 99-3673 cons. (7th Cir. March 13, 2001) (prepurchase aircraft inspector); 
General Electric Capital Corp. v. Equifax Services, Inc.
,
 797 F. Supp. 1432 (N.D. Ill. 1992)(prepurchase inventory inspector); 
Perschall v. Raney
,
 137 Ill. App. 3d 978, 484 N.E.2d 1286 (1985)(termite inspector)); a title insurer (
Notaro Homes, Inc. v. Chicago Title Insurance Co.
,
 309 Ill. App. 3d 246, 257, 722 N.E.2d 208 (1999)); real estate brokers (
Duhl v. Nash Realty, Inc.
, 102 Ill. App. 3d 483, 429 N.E.2d 1267 (1981); 
Menard, Inc. v. U.S. Equities Development, Inc.
,
 No. 01 C 7142 (N.D. Ill. February 28, 2002) (mem. op.)); and stockbrokers (
Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
,
 68 Ill. App. 3d 75, 385 N.E.2d 376 (1979)).

In these cases, the product was purely information--the consumer received analytical work rather than a tangible product.  ‘In other words, the end product [was] the ideas, not the documents or other objects into which the ideas [were] incorporated.’  
Tolan & Son
,
 308 Ill. App. 3d at 29, citing 
Congregation of the Passion
,
 159 Ill. 2d at 163.  ‘[S]upplying information need not encompass the enterprise's entire undertaking [for the defendant to fall within the information provider exception,] but [information] must be central to the business transaction between the parties.’  
Tolan & Son
,
 308 Ill. App. 3d at 29, citing 
General Electric Capital
,
 797 F. Supp. at 1443.

In contrast, when the information offered by the defendant relates to the defendant's tangible goods and/or noninformational goods or services, the information is considered merely ancillary or incidental, and the defendant is not deemed to be in the business of providing information and is not liable for negligent misrepresentation. 
 
Tolan & Son
,
 308 Ill. App. 3d at 29, citing 
General Electric Capital Corp.
,
 797 F. Supp. at 1442.
 Examples of defendants in this category include manufacturers and sellers of tangible goods such as computers and construction materials (
Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.
,
 109 Ill. App. 3d 132, 440 N.E.2d 282 (1982)(manufacturers and sellers of computers and software), 
overruled in part on other grounds
, 
Fireman's Fund Insurance Co. v. SEC Donohue, Inc.
,
 176 Ill. 2d 160, 166, 679 N.E.2d 1198 (1997); 
Knox College v. Celotex Corp.
,
 117 Ill. App. 3d 304, 453 N.E.2d 8 (1983)(manufacturers and sellers of roofing materials); (
Anderson Electric, Inc. v. Ledbetter Erection Corp.
,
 115 Ill. 2d 146, 503 N.E.2d 246 (1986)(manufacturers of electrical devices); 
Menard
, Inc. v. U.S. Equities Development, Inc.
,
 No. 01 C 7142 (N.D. Ill. February 28, 2002)(mem. op.)(construction supply firm)).
 An additional example includes an architect and engineer retained to design and build townhomes who did not advise their client that the site's soil was highly compressible and could not support the buildings' foundations.  
Tolan & Son
,
 308 Ill. App. 3d at 31.”  
Fox Associates, Inc. v. Robert Half International, Inc.
, 334 Ill. App. 3d 90, 93-95 (2002).

“The allegation that a defendant is in the business of providing information for the guidance of others is a legal conclusion that must be supported by well-pled factual allegations. 
 
Tolan & Son
,
 308 Ill. App. 3d at 28.  To determine whether a party is in the business of supplying information, the precise facts of the specific case must be analyzed.  
Tolan & Son
,
 308 Ill. App. 3d at 27.  The determination is dependent upon the nature of the information at issue and its relation to the kind of business being conducted.  
Tolan & Son
,
 308 Ill. App. 3d at 28.  ‘“The critical question *** is whether the information is an important part of the product offered.  [A] business[ ] will be deemed to be in the business of supplying information if the information furnished along with the non-informational goods or services is central to the business transaction.  [Citation.]
”’ 
 
T
olan & Son
,
 308 Ill. App. 3d at 29.”  
Fox Associates
, 334 Ill. App. 3d 95-96.

First Midwest argues that the trial court erred when it granted Stewart Title’s motion to dismiss count II of its second amended complaint.  First Midwest claims that count II sufficiently stated a cause of action for negligent misrepresentation.  It is First Midwest’s contention that Clear Title, Stewart Title’s agent, issued a commitment for title insurance which failed to contain a reference to the existence of a recorded restrictive covenant against the premises which prohibited the use of the property for business or commercial purposes.  First Midwest points out that the Bergerons wanted to use the premises for both residential and business purposes.  First Midwest complains that it would not have approved of the initial $300,000 loan or any subsequent loan to the Bergerons if it had known of this restriction.

First Midwest contends that the purposes for which the property could be used was a statement of material fact to all the parties of the transaction.  Consequently, First Midwest maintains that Stewart Title’s failure to report the restrictive covenant constitutes a false statement of material fact.

First Midwest avers that Stewart Title is in the business of researching titles and providing title insurance to buyers and sellers of real estate and to lenders that make loans for the purchase of real estate.  First Midwest argues that an integral part of the transaction in the sale of a parcel of real estate is the commitment for title insurance.

First Midwest maintains that the commitment is the title company’s representation of the state of the title.  First Midwest asserts that the title commitment is the title company’s basis for issuing a title insurance policy.  First Midwest argues that prospective purchasers and lenders rely on the title commitment to provide them with vital information which affects their decision as to whether they should complete the transaction. 

As such, First Midwest contends that Stewart Title is in the business of providing information.  First Midwest argues that because of the importance of the information, Stewart Title should have a duty to accurately report the information it disseminates.  It is First Midwest’s position that the issue here is whether Stewart Title is in the business of supplying information, so as to allow a suit in tort for this particular kind of negligence.  First Midwest relies on 
Notaro Homes, Inc. v. Chicago Title Insurance Co.
, 309 Ill. App. 3d 246 (1999) to support its position.  

In 
Notaro Homes
, the plaintiff alleged that the defendant, Chicago Title Insurance Co., negligently misrepresented the condition of a title by failing to disclose the existence of a recorded zoning amendment.  The 
Notaro Homes
 court determined that the plaintiff had indeed stated a cause of action.  The relevant portion of the court’s ruling follows:

“We now examine whether the 
Moorman
 doctrine applies.  Plaintiff acknowledges that the 
Moorman
 doctrine does prohibit a recovery in tort for purely economic losses but argues that the doctrine does not apply to those in the business of supplying information for the guidance of others in their business transactions and, in this case, the above exception applies. 

We believe the exception to 
Moorman
 does apply to cases where a prospective purchaser orders a commitment for title insurance and in reliance thereon enters into a business transaction.  When a title insurance company issues a commitment, it is in fact in the business of supplying information for the guidance of others in their business transactions, whether the transaction is the decision to purchase property or the decision to simply purchase the title insurance policy.  It owes a duty not to be negligent in providing the information, and, if negligent, the injured party may recover economic damages.
 By this decision, we are not holding that failure to set forth the recorded ordinance was a negligent misrepresentation.  Whether the ordinance impacted the use and value of the property to the extent that it affected the property's marketability is a question of fact to be resolved by the trier of fact.  Additionally, the plaintiff's level of sophistication and the degree to which it relied upon the commitment are questions of fact for the trier of fact to determine.  Further, we are not stating as a matter of law that in all instances a land title insurance company will be responsible under the theory of negligent misrepresentation.  The scope of a title insurance company's duty to disclose may be limited based upon the agreement of the parties when the commitment for title insurance is purchased.”  
Notaro Homes, Inc.
, 309 Ill. App. 3d at 257.

Here, the trial court’s decision to dismiss count II of First Midwest’s second amended complaint was correct.  We find that the exception to the 
Moorman
 rule does not apply in this situation, and subsequently, we find that First Midwest failed to sufficiently state a cause of action for negligent misrepresentation.

Instead of 
Notaro
, we find that the 
University of Chicago Hospitals v. United Parcel Service
, 231 Ill. App. 3d 602, 606 (1992), is instructive.  There an employee of an insurance company informed a hospital that a patient had $350,000 in health insurance benefits.  Relying on this information, the hospital rendered the patient hospital and medical services.  Thereafter, the hospital sought payment from the insurance company.  However, the insurance company denied the claim for the reason that the patient only had $50,000 worth of insurance benefits.  Thereafter, the hospital filed a claim for negligent 

misrepresentation.  The trial court determined that the hospital had failed to state a cause of action.

On appeal, the 
University of Chicago Hospitals
 court held that an insurance company is not in the business of providing information.  Its reasoning follows:

 “Although neither of the parties cites any Illinois authority as to whether or not insurance carriers are in the business of supplying information, the District Court for the Northern District of Illinois provides a case on point.  In 
International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.
, (N.D. Ill. Aug. 17, 1989), No. 88 C 320 (memorandum opinion), the defendant maintained that the plaintiff's claim of negligent misrepresentation ‘must be dismissed because it fails to allege, and cannot allege, that [the defendant] was in the business of supplying information.’  (
Fireman's Fund
,
 slip op. at ___.)  The plaintiff retorted that the defendant's ‘business--indeed, the raison d'etre of insurance--is supplying and receiving information.’ (
Fireman's Fund
,
 slip op. at ___.)  The court found this argument to be unconvincing, holding that the business of an insurance company is 

‘accepting a risk in return for money.  [The defendant] is not 'in the business' of supplying information for the guidance of others.  To hold otherwise would render every commercial enterprise which enters into a contract [with] a company in the business of supplying information, thereby opening the flood-gates for negligent misrepresentation litigation.  Accordingly, because [the plaintiff] has failed to allege and cannot allege that [the defendant] is in the business of supplying information, Count II must be dismissed.’ (
Fireman's Fund
,
 slip op. at ___.)

While the hospital would contend that 
International Surplus Lines
 is not binding on this court, we find it to be persuasive authority.”  
University of Chicago Hospitals
, 231 Ill. App. 3d at 606.

Following the reasoning of 
University of Chicago Hospitals
, we find that Stewart Title was not in the business of providing information when it issued the title commitment to First Midwest. 

The issuance of a title commitment is not a sale of information concerning the state of a title.  Instead, a title commitment is simply and solely a declaration of the title insurer’s willingness to insure a defined title, at a future date, after a contemplated transaction is consummated and to indemnify at that time for covered defects according to the terms and conditions of the specified promised policy.

An insurance policy or commitment is not sold to be relied upon as affirmative statements of fact about the nonexistence of the insured risk.  Rather, title insurers promise that if covered encumbrances are subsequently found, the insured will be indemnified against loss, subject to the terms of the policy.  In this particular instance, Stewart Title was in the business of selling insurance and consequently of assuming risks.

There are three things that a title insurance company offers: (1) minutes of foreclosure, (2) preliminary letters of coverage or title commitments, and (3) abstracts of title.  Two of the three can be considered information, 
viz
., minutes of foreclosure and an abstract of title.  The minutes of foreclosure and the abstract of title are not insurance but, rather, are a specialized or complete history of a particular parcel of land which includes some or all of the entries of record as to the property.  First Midwest did not purchase this from Stewart Title.  

The title commitment, by contrast, indicates stated objections 
that will not be covered
 unless upon further examination or documentation they are waived by a title officer.  Any matter that is not so stated as an exception to coverage is in fact 
covered
 by the policy that is later issued.  Therefore, in this case the policy would have covered any loss caused by the restrictive covenant if the policy were still in force and not cancelled by the pay off of the insured loan.

Furthermore, title insurance is a product and not an idea or an intangible idea.  The ultimate result of the transaction between Stewart Title and First Midwest was a product, insurance. Any information contained in the commitment Stewart Title issued was merely ancillary to the purchase and sale of a product, namely, title insurance.

CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

Greiman, J., concurs.

JUSTICE QUINN, specially concurring in part and dissenting in part:

I concur in part and dissent in part.  I concur with the majority that the language in Section 2(a), 
CONTINUATION OF INSURANCE, After Acquisition of Title
, does not operate to prevent Stewart Title from terminating their liability under Section 9(c): "Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations."   Consequently, I agree with the majority that the circuit court correctly granted summary judgment to Stewart Title on count I.

I also concur with the majority that count II, which alleged negligent misrepresentation was properly dismissed.  However, I believe that count II should have been dismissed because the title policy had been terminated by the payoff of the insured loan, not because count II failed to properly state a claim based on Stewart Title's negligent misrepresentation.  While the majority's holding in this regard is clearly 
dicta
, I write separately because I believe the holding is erroneous and is capable of causing damage by depriving persons utilizing the services of title companies of the use of a possible remedy when the title company fails to do their job.

As the majority point out, in 
Nataro Homes, Inc. v. Chicago Title Insurance Co.
, 309 Ill. App. 3d 246 (1999), the appellate court held: "We believe the exception to 
Moorman (Manufacturing Co. v. National Tank Co.
, 91 Ill. 2d 69 (1982)) does apply to cases where a prospective purchaser orders a commitment for title insurance and in reliance thereon enters into a business transaction.  When a title insurance company issues a commitment, it is in fact in the business of supplying information for the guidance of others in their business transactions, whether the transaction is the decision to purchase property or the decision to simply purchase the title insurance policy.  It owes a duty not to be negligent in providing the information, and, if negligent, the injured party may recover economic damages."  
Nataro Homes, Inc. v. Chicago Title Insurance Co.
, 309 Ill. App. 3d at 257.

The majority do not say that 
Nataro
 was wrongly decided.  Rather, they find that title commitments made by title insurance companies cannot be considered to be "information."  The majority find that 
University of Chicago Hospitals v. United Parcel Service
, 231 Ill. App. 3d 602 (1992) "is instructive."  I believe that 
University of Chicago Hospitals
 is completely inapposite.  It makes perfect sense that medical insurers are not in the business of supplying information.  Persons purchasing medical insurance are certainly not doing so in an effort to obtain information upon which they can rely.  However, persons purchasing title insurance, whether it be in the form of minutes of foreclosure, title commitments or abstracts of title, rely on the title insurer's search to research the applicable law and the records before issuing the commitment and to provide warnings about areas in which the purchaser might find title surprises.  
Oak Park Trust & Savings Bank v. Intercounty Title Co.
, 287 Ill. App. 3d 647, 650 (1997).

While I agree that it is not absolutely certain that title insurance companies may be held liable under the theory of negligent misrepresentation (see 
Nataro Homes, Inc. v. Chicago Title Insurance Co.
, 309 Ill. App. 3d at 257 and 
W.E. Erickson Construction, Inc. v. Chicago Title Insurance Co.
, 266 Ill. App. 3d 905, 911 (1994)), this court should not come to a contrary conclusion in 
dicta
 in the instant case.    

                   

FOOTNOTES
1:
Count III, alleging fraudulent misrepresentation, was also dismissed by the trial court, but the appellant does not appeal from that portion of the order.